*Janet Jarvis Street, et al. v. Upper Chesapeake Medical Center, Inc., et al.*, No. 696, September Term, 2022. Opinion by Eyler, Deborah S., J.

**"RELATED SPECIALTY" UNDER STATUTE GOVERNING BOARD CERTIFICATION OF EXPERT WITNESS WHO MAY TESTIFY TO STANDARD OF CARE IN MEDICAL NEGLIGENCE CASE - - INFORMED CONSENT DUTY TO ADVISE OF ALTERNATIVE TREATMENT OPTIONS - - STANDARD OF CARE BASED ON INTERNAL RULE OF HEALTH CARE PROVIDER - - SEPARATE STRIKES FOR DEFENDANTS WITH CONFLICTS - - JURY INSTRUCTION ON PROXIMATE CAUSATION.**

The appellant was seen in emergency room with complaints of her right foot being cool and pale, with symptoms increasing when leg elevated. Emergency medicine doctor found pedal pulses but ankle brachial index score for the right foot was abnormal. The doctor found diminished arterial blood flow that was not emergent/urgent. She advised the appellant to see a vascular surgeon in three to five days, giving her a name and contact information, and to return to the emergency room before then if her symptoms worsened. Two days later the appellant returned to the emergency room with increased symptoms and was admitted to the hospital. A vascular surgeon was called for a consult, which was not labeled "stat," but did not see the appellant that day or the next. The appellant was suffering from right lower extremity ischemia due to diminished arterial blood flow. When other interventions did not work, she underwent a below-the-knee amputation of the right leg. She and her husband sued the emergency room physician and the vascular surgeon (and other physicians later dismissed) and the entities they worked for, alleging ordinary medical negligence against both and lack of informed consent against the emergency medicine physician. At trial, at the close of the appellant's case-in-chief, the court granted judgment in favor of the emergency medicine physician on the informed consent claim. The jury returned a defense verdict on all counts submitted to it.

*Held*: Trial court's judgments affirmed in part and vacated in part.

- The trial court precluded the appellant's board-certified vascular surgery expert from testifying that the emergency medicine physician breached the standard of care by not arranging an immediate consultation by a vascular surgeon. Because the emergency medicine physician was board certified, standard of care testimony against her only could be given by a physician board certified in the same or a "related" specialty. Specialties are related for this purpose when under the circumstances of the case they overlap or involve symmetry of treatment. Here, the emergency medicine physician's role was to evaluate patients on the front-line. The vascular surgeon was not a front-line caregiver who would determine whether a consultation was needed but was a specialist who saw patients upon referral or

consultation.  As such, the trial court's ruling that the physicians were not in related specialties in the context of this case was not an abuse of discretion.

- The appellant contended that the emergency room physician's recommendations were a "treatment plan" and therefore she was required to obtain the appellant's informed consent, including advising her of reasonable alternative treatment options.  These included treatments the emergency medicine physician was not recommending, such as admission to the hospital, because in her medical judgment the appellant did not need them at that time.  They were the same treatments the appellant was claiming the emergency medicine physician breached the standard of care by not performing.  The trial court granted judgment in favor of the emergency medicine physician, ruling that this evidence was legally insufficient to prove breach of the disclosure duty imposed by the doctrine of informed consent.  The trial court did not err.  The recommendations were not a treatment plan and, if they were, the doctrine of informed consent does not impose on a physician a duty to disclose treatment options that he or she does not recommend because they are not indicated.  Such a claim is grounded in ordinary medical negligence, not informed consent.

- The trial court abused its discretion by ruling that the appellant's vascular surgery expert could not opine that the vascular surgeon breached the standard of care by failing to perform a consult on the appellant within two to three hours of being advised of her condition.  The court accepted that an internal rule of the vascular surgeon's medical practice, that a consult request that is not designated "stat" may be performed within 24 hours of the request, established the standard of care, and ruled that the appellant's expert witness could not testify to the contrary.  However, an internal rule of a defendant, and in particular of a health care provider, does not fix the standard of care, which under well-settled Maryland law is a national standard of care.

- The trial court did not abuse its discretion by allowing two groups of defendants - - the emergency medicine physician and the entities she was associated with and the vascular surgeon and the entity he was associated with - - separate peremptory strikes because their positions were adverse and hostile, especially with respect to the issue of causation.

- The trial court did not err by giving a proximate cause jury instruction based on the 5th edition of the Maryland Civil Pattern Jury Instructions then in effect and denying the appellant's requested jury instruction from the prior 4th edition of that volume.  The instruction as given properly stated the law and covered the topic that the

appellant's instruction covered. The 5th edition instruction does not undermine the precept that a defendant's negligence must be a cause, not the only cause, of the plaintiff's injuries.

Circuit Court for Harford County
Case No. C-12-CV-20-000135

<u>REPORTED</u>

<u>IN THE APPELLATE COURT</u>

<u>OF MARYLAND</u>

No. 696

September Term, 2022
_____

JANET JARVIS STREET, ET AL.

v.

UPPER CHESAPEAKE MEDICAL CENTER,
INC., ET AL.
_____

Tang,
Albright,
Eyler, Deborah S.
   (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Eyler, Deborah S., J.
_____

Filed: March 1, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In the Circuit Court for Harford County, Janet Jarvis Street, the appellant, sued Upper Chesapeake Medical Center, Inc. ("Hospital"), Upper Chesapeake Emergency Medicine Physicians, LLC ("UCEMP"); Le Nha "Mimi" Lu, M.D.; Vascular Surgery Associates, LLC ("VSA"); and Mark D. Gonze, M.D., for medical malpractice.[1] She alleged that negligence by Drs. Lu and Gonze resulted in her having to undergo a below-the-knee amputation of her right leg.[2]

After a two-week trial, the jury returned a defense verdict. Mrs. Street noted a timely appeal from the judgments, posing five questions for review, which we have reordered and rephrased:

I.    Did the trial court abuse its discretion by precluding Dr. Bauer Sumpio from giving standard of care opinions about Dr. Lu?

II.   Did the trial court err by granting judgment to Dr. Lu on Mrs. Street's informed consent claim?

III.  Did the trial court abuse its discretion by precluding Dr. Sumpio from giving standard of care opinions about Dr. Gonze regarding the events of June 18 and 19, 2017?

---

[1] Michael Street, Mrs. Street's husband, also was a plaintiff below and is an appellant before this Court. For ease of discussion, we shall refer to Mrs. Street as the appellant, unless there is a reason also to refer to Mr. Street.

[2] The entities were sued for vicarious liability: the Hospital and UCEMP for the alleged negligence of their agents, which included Dr. Lu, and VSA for the alleged negligence of Dr. Gonze. For ease of discussion, we shall refer to Dr. Lu and Dr. Gonze when speaking of them and the entities they were associated with and only shall refer to the entities as necessary.

Mrs. Street also sued Sumit Bassi, M.D. and Dhiraj Gurung, M.D., who were alleged to be agents of UCEMP and the Hospital. Dr. Bassi was dismissed with prejudice a few days before trial. Summary judgment was granted in favor of Dr. Gurung. That ruling is not challenged on appeal.

IV.    During jury selection, did the trial court abuse its discretion by allowing two groups of defendants to exercise five peremptory strikes each?

V.    Did the trial court err by denying Mrs. Street's requested jury instruction on causation, instead giving a more recent pattern instruction?

We conclude that the trial court did not err or abuse its discretion by precluding Dr. Sumpio from giving standard of care opinions about Dr. Lu; granting judgment for Dr. Lu on the informed consent claim; allowing two groups of defendants to exercise five peremptory challenges each; and denying Mrs. Street's requested causation instruction.[3] It did abuse its discretion by precluding Dr. Sumpio from giving standard of care opinions about Dr. Gonze regarding June 18 and 19, 2017, and that error was prejudicial.[4]

## FACTS AND PROCEEDINGS

The events central to this appeal took place between June 14, 2017 and June 19, 2017.[5] On June 14, Mrs. Street underwent a small bowel enteroscopy at a hospital not

---

[3] Dr. Lu, the Hospital, and UCEMP noted a conditional cross-appeal, asking whether the trial court erred by denying their motion for judgment at the close of Mrs. Street's case-in-chief. Because we are affirming the judgments in their favor, we shall not address the cross-appeal.

[4] As the mandate reflects, we shall affirm the judgments in favor of Dr. Lu, the Hospital, and UCEMP. At trial, Mrs. Street presented evidence that Dr. Gonze was negligent in the care and treatment he rendered on and after June 20, 2017. The jury returned a verdict in favor of Dr. Gonze and VSA across the board. On appeal, Mrs. Street has not challenged any rulings pertaining to Dr. Gonze's care and treatment of Mrs. Street on and after June 20, 2017. Therefore, the judgment in favor of Dr. Gonze and VSA with respect to June 18 and 19, 2017 is vacated and remanded for further proceedings not inconsistent with this opinion, but the judgment in their favor based on the allegations pertaining to care and treatment on and after June 20, 2017 stands.

[5] Unless otherwise indicated, all dates are in 2017.

involved in this litigation.[6]  The next day, she visited Patient First in Bel Air with complaints of severe right-sided back pain.  She was prescribed Flexeril and told to go to an emergency room if her symptoms increased.[7]

On June 16, shortly before noon, Mrs. Street went to the emergency room at the Hospital.  An initial triage note states that her right foot was "pale & cool" with "no palp[able] pulses" and "cyanotic toenails."[8]  A nursing note documented that on initial examination, the pedal pulses were "strong bilaterally[.]"  After Mrs. Street had been resting in a chair for a short time, however, her right foot was "cold and dusky."  Mrs. Street reported that when she lay on her right side, her right foot would "become[] numb and blue[.]"

Dr. Lu, a board-certified emergency medicine physician, was assigned to Mrs. Street that day.  Mrs. Street told Dr. Lu that beginning after the enteroscopy she developed sciatica-type back pain and right foot numbness, and the toes of her right foot would become blue when she elevated her leg.  She had taken part of the recommended dose of Flexeril, which helped somewhat.  An ultrasound Dr. Lu ordered did not show evidence of deep vein thrombosis but did show an Ankle Brachial Index ("ABI") score of 0.6 in the right dorsal pulse, as compared to 1.3 in the left dorsal pulse, "with palpable pulses."  A

---

[6] That procedure was performed in an effort to diagnose the source of chronic anemia Mrs. Street was experiencing, which had been necessitating blood transfusions.

[7] Patient First was not sued in this case.

[8] All quotations in this recitation of the facts are from hospital and medical records admitted in evidence at trial.

3

0.6 reading is an abnormally low value. On physical examination, Dr. Lu found normal sensation and motor strength in Mrs. Street's lower right leg and foot, palpable pulses bilaterally, and no cyanosis of the toes of the right foot when Mrs. Street was seated or lying down.

Dr. Lu saw "no evidence of emergent vascular compromise to warrant emergent/urgent intervention at this time, however due to her lower ABI, rec[ommend] close f[ollow]/u[p] [with] vascular surgery if symptoms continue." She continued, "Patient well-appearing and well-hydrated without clear indication for condition requiring immediate inpatient hospitalization or surgery. Stable for trial outpatient management and continued supportive care." She documented that she discussed the test results and her recommendations with Mrs. Street and her husband and that she "[r]ecommend[ed] close follow-up [with] vascular surgery about her diminished arterial blood flow to her right foot or return to [the emergency room] for new, worsening or concerning symptoms."

Dr. Lu answered Mrs. Street's questions, and Mrs. Street voiced an understanding of what she was told. Mrs. Street's discharge instructions were to see a vascular surgeon in three to five days, and she was given the contact information for Peter Mackrell, M.D. She left the emergency room at 6:34 p.m.

The next day, June 17, Mrs. Street returned to Patient First complaining of continuing cold in her right foot, "blue at times and red with pain[,]" and continuing back pain. The examining physician expressed concern about vascular disease and recommended she go to the emergency room immediately. The diagnosis was "[p]eripheral vascular disease, unspecified[.]" She was discharged at 8:51 p.m.

4

On June 18, at 9:25 a.m., Mrs. Street returned to the Hospital emergency room. On triage, at 9:41 a.m., she recounted her history and that the top of her right foot was "icy cold" and extremely tender with pain in her toes. She reported that the pain had progressed and still would increase when her leg was elevated. Her assigned nurse had trouble finding a pedal pulse on the right side with a doppler machine. Sumit Bassi, M.D., the emergency room physician assigned to Mrs. Street that day, was evaluating Mrs. Street at that time. The pulses could not be heard when the right leg was elevated and the foot was flexed. The toenail beds were blue when the leg was elevated.

Dr. Gonze was the VSA on-call vascular surgeon on June 18. Dr. Bassi telephoned him about Mrs. Street while she was in the emergency room. According to a proffer by Mrs. Street, Dr. Bassi does not recall the exact substance of that telephone conversation but would have followed his usual practice when calling a consultant, of recounting all the information he had about the patient. Dr. Bassi's note about that call states: "I discussed with the vascular surgery [sic] Dr. Gonze and he recommended patient to have a follow-up as an outpatient." Despite that recommendation, Dr. Bassi decided to admit Mrs. Street to the Hospital "for observation and she can see vascular as an inpatient." He discussed this plan with two other doctors, who agreed with it. Dr. Bassi's clinical impression was "1. Right lower extremity swelling 2. Right lower extremity ischemia." Mrs. Street was admitted to the Hospital at 12:25 p.m.

At 1:56 p.m., Lindsey Brunson, the unit secretary at the Hospital, entered in the Hospital record a request for a consult to VSA. She called Dr. Gonze and spoke directly to him, telling him that Mrs. Street had been admitted to the Hospital. Mrs. Street proffered

5

that, if called to testify, Ms. Brunson would say that "the information exchanged during that telephone call would have included the reason for the consultation, which is right lower extremity ischemia. The consulting provider being Vascular Surgeon Associates" and that she "would have relayed the patient's room number to Dr. Gonze at the time of this telephone conversation."

Dr. Gurung became Mrs. Street's attending physician upon her admission to the Hospital. His admitting note, written at 3:56 p.m., stated under "Plan," among other things:

> Vascular surgical consult is requested for further recommendation. The ER physician had talked to [the] on-call vascular surgeon, Dr. Gonze today who had initially advised for follow-up as outpatient. Since the patient has been having continuous pain with swelling and discoloration of the right foot, the decision was made by ER physician to admit the patient under observation for inpatient evaluation by vascular surgeon.

Later in the note, Dr. Gurung stated, "If there are any signs of acute occlusion of dorsalis pedis artery, we will consult on-call vascular surgeon stat and get further recommendation. Otherwise, patient will most likely be evaluated in the morning tomorrow [June 19] by vascular surgeon."

Dr. Gonze did not come to the Hospital on June 18 to perform a consult on Mrs. Street. No vascular surgery consult was performed on Mrs. Street that day or the next (June 19). Dr. Gonze was not the on-call vascular surgeon for VSA on June 19 and was off work that day.

Dr. Gonze first saw Mrs. Street on June 20. Thereafter, he was involved in her care, performing procedures to address her right leg ischemia and ultimately the below-the-knee

6

amputation of her right leg.  Those treatments, rendered on or after June 20, are not at issue in this appeal.

**DISCUSSION**

**I.**

**THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY PRECLUDING DR. SUMPIO FROM GIVING STANDARD OF CARE TESTIMONY ABOUT DR. LU**

Mrs. Street's medical negligence claim against Dr. Lu was tried to the jury, with Ronald Paynter, M.D., a board-certified emergency medicine doctor, testifying that Dr. Lu had breached the standard of care in her treatment of Mrs. Street.  The jury returned a verdict in favor of Dr. Lu on that claim.

In addition to Dr. Paynter, Mrs. Street had planned to call Bauer Sumpio, M.D., a board-certified vascular surgeon, to testify that Dr. Lu had breached the standard of care. Before trial, Dr. Lu filed a motion *in limine* to preclude Dr. Sumpio from doing so.  The motion was based on a provision of the Health Claims Arbitration Act (1976) ("Act") stating (with exceptions that do not apply here) that when a defendant is board certified in a specialty, an expert witness providing a certificate of qualified expert or testifying at trial on the standard of care must be board certified in "the same or a related specialty as the defendant."  Md. Code (1974, 2020 Repl. Vol.), § 3-2A-02(c)(2)(ii)(1)(B) of Courts & Judicial Proceedings Article ("CJP").[9]  Dr. Lu maintained that given her role in this case,

---

[9] In relevant part, CJP § 3-2A-02(c)(2)(ii) states:

(continued…)

vascular surgery was not a "related specialty" to emergency medicine and therefore Dr. Sumpio was not qualified to give standard of care testimony about her. Mrs. Street filed an opposition taking the contrary position.

On the first day of trial, prior to jury selection, the court took up Dr. Lu's motion *in limine*. Dr. Lu argued, based on cases interpreting "related specialty" in CJP § 3-2A-02(c)(2)(ii)(1)(B), that the specialties were not related. In her response, Mrs. Street pointed out that Dr. Sumpio had provided a certificate of qualified expert and report in which he had opined that Dr. Lu breached the standard of care by failing to "diagnose and treat M[r]s. Street's diminished arterial blood flow," "order the appropriate diagnostic testing[,]" "request a vascular consultation[,]" "implement appropriate medical care and treatment[,]" and "work up Ms. Street[,]" and by sending her home as opposed to admitting her to the Hospital. Mrs. Street argued that in the context of those alleged breaches, the specialties of emergency medicine and vascular surgery were related.

---

1. In addition to any other qualifications, a health care provider who . . . testifies in relation to a proceeding before a . . . court concerning a defendant's compliance with or departure from standards of care:
A. Shall have had clinical experience, provided consultation relating to clinical practice, or taught medicine in the defendant's specialty or a related field of health care, or in the field of health care in which the defendant provided care or treatment to the plaintiff, within 5 years of the date of the alleged act or omission giving rise to the cause of action; and
B. Except as provided in subsubparagraph 2 of this subparagraph, if the defendant is board certified in a specialty, shall be board certified in the same or a related specialty as the defendant.

8

In the course of countering that argument, counsel for Dr. Lu read the following excerpt from Dr. Sumpio's deposition (taken after the certificate and report were provided), commenting that it makes clear Dr. Sumpio "doesn't claim to know what the standard of care is that applies to Dr. Lu":

> [Dr. Lu's counsel]: Okay. So are you comfortable rendering standard of care opinions against an emergency medicine physician?
>
> [Dr. Sumpio]: Only in the fact that with respect to when I would expect a consultation as a vascular surgeon.

After some discussion of another pending motion, the court returned to Dr. Lu's motion and stated: "As to [Dr. Sumpio] being able to testify as to the emergency room's doctor, I will grant the motion, but he is free to make that argument."

When the evidence phase of the trial commenced, Mrs. Street called Dr. Sumpio as her first witness.[10] After he had finished testifying, counsel for Mrs. Street asked to put a proffer on the record about his standard of care and causation testimony with respect to Dr. Lu. The proffer was as follows:

> Dr. Sumpio will opine based on his knowledge, training, and experience with respect to consults that he is routinely asked to perform in both the emergency room and hospital settings that Dr. Mimi Lu *breached the standards of care in her care and treatment of Janet Street on June 16th, 2017, by failing to consult with vascular surgery during [Mrs. Street's] visit to the emergency room,* based on the signs and symptoms that were documented by the health care providers, including discoloration, numbness, pain, and pulselessness that were identified in her toes and/or feet as well as the abnormal 0.6 ABI test result.

---

[10] By that point in the proceedings, the court also had ruled that Dr. Sumpio could not give standard of care testimony regarding Dr. Gonze pertaining to June 18 and 19, 2017. Dr. Sumpio testified that Dr. Gonze breached the standard of care on and after June 20, and on causation.

9

> ***Dr. Sumpio will further opine to a reasonable degree of medical probability that Dr. Lu's failure to consult with vascular surgery was a cause of Mrs. Street's injuries and damages, including her below the knee amputation.***

(Emphasis added.)

Before this Court, Mrs. Street contends the trial court abused its discretion by precluding Dr. Sumpio from giving standard of care testimony against Dr. Lu. She maintains, as she did below, that vascular surgery was related to emergency medicine within the context of this case, and therefore Dr. Sumpio's standard of care opinion was admissible.

A premise to Mrs. Street's argument is that, had Dr. Sumpio been permitted to testify, he would have opined consistent with her counsel's references during argument on the motion *in limine* to the standard of care opinions expressed in his certificate and report. She ignores the proffer her counsel gave immediately after Dr. Sumpio's testimony. In our view, that proffer is controlling, for two reasons.

First, when a court grants a motion *in limine* precluding evidence either before trial or during trial but before the evidence would be introduced, and the court clearly intends its ruling to be "the final word on the matter" at trial, the proponent of the evidence need not offer the evidence or make another proffer to preserve for review the question whether the evidence properly was precluded. *Prout v. State*, 311 Md. 348, 357 (1988), *superseded by rule on other grounds*. In *Prout*, the proponent thoroughly proffered the evidence in question when the *in limine* motion was argued. At that time, the trial judge ruled that the evidence would not be admitted and instructed counsel not to proffer it again. On those

10

facts our Supreme Court held that the question whether the trial court's *in limine* ruling was in error was preserved for review without the proponent's moving to admit the evidence or making another proffer at trial. *See id.* at 357-58. *See also J.L. Matthews, Inc. v. Md.-Nat'l Cap. Park & Plan. Comm'n*, 368 Md. 71, 106 n.29 (2002); *Simmons v. State*, 313 Md. 33, 38 (1988); *Martinez v. Johns Hopkins Hosp.*, 212 Md App. 634, 658-59 (2013).

In the case at bar, upon granting the motion *in limine*, the trial court said nothing to indicate an intention for the ruling to be the "last word" on the issue. On the contrary, the judge said, "I will grant the motion, but [counsel for Mrs. Street] is free to make the argument[,]" *i.e.*, that Dr. Sumpio should be allowed to give standard of care testimony regarding Dr. Lu. During the argument on the *in limine* motion, counsel for Mrs. Street recited opinions stated by Dr. Sumpio in his certificate and report in general terms, not clearly identifying that as a proffer. Immediately after Dr. Sumpio testified, counsel for Mrs. Street gave a proffer of what Dr. Sumpio's standard of care testimony about Dr. Lu would have been had he been permitted to testify about it. Counsel for Mrs. Street must have thought it was necessary to make this proffer, or she would not have done so. The judge did not intervene and direct counsel not to make the proffer. Instead, the court allowed counsel to proceed, which she did. Although preservation is not an issue, from the reasoning in *Prout* and its progeny, we conclude that Mrs. Street's appellate challenge to the court's *in limine* ruling is circumscribed by the proffer she made at the conclusion of Dr. Sumpio's testimony.

11

Second, principles of waiver dictate the same result. In *U.S. Gypsum Co. v. Mayor and City Council of Baltimore*, 336 Md. 145, 174-75 (1994), the Court held that when a party loses a motion *in limine* seeking to preclude certain evidence, and the party objects to the admission of the evidence when offered at trial, the only issue preserved for review on appeal is the subject of that objection. All other grounds are waived, including those raised in the motion *in limine* to begin with. In the case at bar, unlike the general summary of opinions recounted by her counsel during argument on the motion *in limine*, Mrs. Street's proffer during trial identified one, specific standard of care opinion Dr. Sumpio would have given. Counsel for Mrs. Street made a deliberate choice to proffer Dr. Sumpio's standard of care testimony regarding Dr. Lu, limiting it to one opinion -- that Dr. Lu had breached the standard of care by not requesting that a vascular surgery specialist see Mrs. Street in the emergency room. Whether counsel's recitation of prospective opinions by Dr. Sumpio during argument on the motion was an adequate proffer is debatable.[11] Counsel for Mrs. Street eliminated that concern by making a proffer at trial; and had she wished to expand that proffer she could have. She limited the proffer to one opinion, a sensible move given that in deposition it was the sole standard of care opinion

---

[11] Indeed, the only specifically described breach recited by counsel was "request a vascular consultation." The others -- failing to "diagnose and treat M[r]s. Street's diminished arterial blood flow[,]" "order the appropriate diagnostic testing[,]" "implement appropriate medical care and treatment[,]" and "work up Ms. Street" -- are so broadly worded that one cannot tell what testing or treatment allegedly should have been rendered. The allegation that she should not have been sent home also is unclear. Given that she was not just sent home, but was discharged with instructions to see an identified vascular surgeon within three to five days or return to the emergency room if her symptoms worsened, it appears to mean that she should have been admitted to the Hospital right then.

12

regarding emergency medicine physicians that Dr. Sumpio testified he felt comfortable giving. Under the reasoning employed by the Supreme Court in *U.S. Gypsum*, Mrs. Street waived any other ground for challenging the trial court's *in limine* ruling.

We now turn to the substantive issue. In three cases, this Court has explored the meaning of "related specialty" in CJP § 3-2A-02(c)(2)(ii)(1). Twice we concluded the specialties involved were related, and once we concluded they were not. In all the opinions, we reasoned that whether specialties are related depends upon the circumstances of the case and in particular upon whether there is a treatment overlap between the specialties.

In *DeMuth v. Strong,* 205 Md. App. 521 (2012), the plaintiff experienced loss of arterial blood supply to the left leg following knee replacement surgery, ultimately resulting in an above-the-knee amputation. He sued his treating physician, a board-certified orthopedic surgeon, for failure to properly diagnose and treat that post-operative complication. The plaintiff's standard of care expert was board certified in vascular surgery. The issue was whether their specialties were related within the meaning of the Act. We interpreted "related specialty" in light of the tort reform objectives of the Act, which were to weed out non-meritorious medical malpractice claims without eliminating or limiting liability for meritorious claims. We held that "related" means associated or connected, and as used to modify "specialty" "embraces fields of health care . . . that, in the context of the treatment or procedure in a given case, overlap." *Id*. at 544. The standard of care issues in the case concerned management of post-operative vascular complications, which are diagnosed and treated both by orthopedic and vascular surgeons. Therefore, the specialties were related for purposes of the Act.

13

A few months later, in *Hinebaugh v. Garrett Cnty. Mem'l Hosp.*, 207 Md. App. 1, 26 (2012), we held that the plaintiff's expert, a dentist board certified in oral and maxillofacial surgery ("OMS"), was not in a specialty related to any of the defendant doctors, one board certified in family medicine and two board certified in radiology. During a stint in jail, the plaintiff was hit in the face by another inmate. He was transported to a hospital where the family medicine doctor examined him and ordered x-rays, which the radiologists read. The x-rays did not show evidence of a fracture. After he was released from jail and the pain in his face continued, he went to the emergency room and was seen by a different family medicine doctor who ordered a CT scan that revealed a fracture. The plaintiff sued the original family medicine doctor and the radiologists for failure to perform a CT scan. We held that in the context of that case, where the family medicine doctor and radiologists were front line physicians and the OMS expert was a specialist whose function was to treat patients already diagnosed with fractures, the board certification specialties of the defendant physicians and the plaintiff's expert witness did not overlap and were not related under the Act. *See id.* at 28-29.

Finally, in *Nance v. Gordon*, 210 Md. App. 26, 41 (2013), we concluded that the defendant physician and the plaintiff's standard of care expert were board certified in related specialties. The plaintiff presented to the emergency room twice, with blood in his urine, and later with a fever, sore throat, and right flank pain. He was diagnosed with a urinary tract infection and given medication, even after a urology physician's assistant saw him and consulted with a urologist. Two years later, the plaintiff returned to the same emergency room with complaints of spitting up blood. Diagnostic tests and a biopsy

14

revealed late-stage kidney disease and irreversible kidney failure. In a suit against defendants including the urologist, the plaintiff submitted a certificate of qualified expert and report by a nephrologist. The urologist defendant and nephrologist expert were board certified in their specialties. The urologist sought to dismiss the claim on the ground that nephrology and urology are not related specialties. We noted that although the two specialties focus on the kidneys, that alone was not sufficient to establish that they were related within the meaning of the Act. However, because the medical task at issue -- making a differential diagnosis of a patient presenting with certain symptoms -- is performed by both specialists, the specialties overlapped and therefore were related for that purpose. *See id.*

Mrs. Street argues that this trilogy of cases supports her position as does *Jones v. Bagalkotakar*, 750 F. Supp. 2d 574 (D. Md. 2010), decided earlier and discussed in *DeMuth*. In *Jones*, an infant was brought to the emergency room with vomiting, diarrhea, choking, inability to keep sustenance down, and abnormal vital signs. At the direction of the emergency room doctor, the parents gave the infant Pedialyte and took him to a pediatrician. The pediatrician's notes described the visit simply as a checkup. Eight days later the parents returned to the pediatrician with the infant, who by then was having convulsions. At the pediatrician's direction they took him to the hospital where he died from complications of severe dehydration. The parents sued the emergency room physician, board certified in emergency medicine and internal medicine, and the pediatrician, board certified in pediatrics. Their certificates of merit against each physician were from a board-certified pediatrician. The emergency room physician moved to dismiss

15

the claim against him on the ground that the pediatrician was not board certified in a specialty related to emergency medicine or internal medicine.

The federal district court denied the motion. Because the Maryland courts had not yet interpreted CJP § 3-2A-02(c)(2)(ii)(1)(B), it took guidance from *Sami v. Varn*, 260 Va. 280, 285 (2000), decided under a Virginia statute requiring standard of care experts in medical malpractice cases to have maintained an "active clinical practice in either the defendant's specialty or a related field of medicine within one year" of the alleged act or omission. *Sami*, 260 Va. at 283 (quotation marks and citation omitted). *See Jones*, 750 F. Supp. 2d at 580-81 (quoting Va. Code § 8.01-581.20). The plaintiff in *Sami* went to the emergency room with complaints of abdominal pain. A pelvic examination was performed by an emergency room doctor, and then by an obstetrician, both of whom concluded that she had suffered a miscarriage. In her malpractice suit, the plaintiff alleged that the doctors performed the examination improperly and as a result failed to determine that she had a second uterus and was pregnant. (When later discovered, the fetus was dead.) The question on appeal was whether at trial an obstetrician could testify that the emergency room doctor had breached the standard of care in how she performed the pelvic examination. The Virginia court held that the obstetrician could testify about the standard of care for performing procedures performed by physicians in both specialties, and pelvic examinations fit into that category. *See id.* (discussing *Sami*). Following this line of reasoning, the *Jones* court characterized the "procedure" in the case before it as "the examination of a child who has fallen ill[,]" and concluded that both the testifying pediatrician and defendant emergency medicine doctor/internist were qualified to examine

16

an initially presenting sick infant. *Id.* at 582. The fact that the defendant's examination was performed in the emergency room rather than a pediatrician's office made no difference. *See id.*

In our view, neither the trilogy of Maryland cases nor *Jones* (or *Sami*) support Mrs. Street's position that, within the context of this case, Dr. Sumpio was board certified in a specialty related to emergency medicine. Orthopedic surgeons, like the defendant in *DeMuth*, and vascular surgeons, like the plaintiff's expert in that case, both diagnose and treat post-operative vascular complications such as the one the plaintiff in *DeMuth* experienced. Physicians in the two specialties practice in parity with respect to the diagnosis and treatment central to the malpractice allegations in that case. In *Nance*, both urologists and nephrologists made differential diagnoses for patients initially presenting with symptoms that could be kidney disease. Likewise, in *Jones*, the emergency medicine/internist defendant and the pediatric expert both were front line doctors in that pediatricians, like emergency medicine doctors, often are the first doctor parents contact when an infant falls ill. In *Sami*, both physicians in both specialties performed pelvic examinations on patients.

No such symmetry existed in *Hinebaugh*, where we explained:

> Any commonality between OMS [plaintiff's expert's board specialty] and either family medicine or radiology [defendants' board specialties] with respect to the initial diagnosis of facial fractures does not exist on the same plane. OMS dentists are not front line health care providers. They are brought into a case upon referral or request of a front line health care provider, usually when a facial fracture diagnosis already has been made or sometimes when the involvement of a specialist in the diagnosis and treatment of facial fractures is needed. Family medicine doctors, radiologists, and OMS dentists all may examine and test patients for possible

17

facial fractures, but they do not do so on an equal footing. Ordinarily, and it is the case with the defendants here, family medicine doctors and radiologists do so as part of a general practice in which they see for initial examination and testing a wide spectrum of patients. For family medicine doctors and radiologists, the spectrum covers possible fractures of any of the bones of the body; and for family medicine doctors alone, the spectrum covers a myriad of symptoms that may signal a problem with any bodily system. OMS dentists examine and test patients as specialists whose area of practice only concerns facial fractures. Thus, the specialties do not overlap in that OMS dentists and family medicine and/or radiology doctors are not by education, training, experience, or competency on an equal footing with respect to the diagnosis and treatment of facial fractures in front line patients.

*Hinebaugh*, 207 Md. App. at 28-29.

The same reasoning applies here. Dr. Lu is a front-line emergency medicine physician who sees "for initial examination and testing a wide spectrum of patients. . . . [T]he spectrum covers a myriad of symptoms that may signal a problem with any bodily system." *See id*. at 29. Dr. Sumpio is a specialist in vascular surgery who sees patients already thought to have vascular disease, not patients presenting for an initial assessment of their symptoms. Moreover, his proffered opinion -- that Dr. Lu breached the standard of care by failing to obtain a consult by a vascular surgeon -- related to something he does not do in his practice. He sees patients for whom consults have been requested; he does not make an initial assessment as to whether a consultation is needed, and when it is needed. And obviously, he does not see in consultation patients for whom an emergency medicine physician decided *not* to recommend a consultation.

This case lacked the overlap and symmetry in treatment present in those cases in which this Court and the federal district court have found "related specialties" within the meaning of CJP § 3-2A-02(c)(2)(ii)(1)(B). Accordingly, the trial court did not abuse its

18

discretion in ruling that Dr. Sumpio was not board certified in a specialty "related to" Dr. Lu's specialty under the circumstances of this case.

## II.

## THE TRIAL COURT DID NOT ERR IN GRANTING JUDGMENT TO DR. LU ON THE INFORMED CONSENT CLAIM

To summarize from the Hospital emergency room record, on June 16 Dr. Lu examined Mrs. Street in the emergency room, ran tests, and concluded that she was experiencing diminished arterial blood flow to the right leg and foot. She found "no evidence of emergent vascular compromise to warrant emergent/urgent intervention at this time" and assessed Mrs. Street as "well-appearing and well-hydrated without clear indication for condition requiring immediate inpatient hospitalization or surgery. Stable for trial outpatient management and continued supportive care." She recommended "close follow-up [with] vascular surgery about [Mrs. Street's] diminished arterial blood flow to her right foot or return to [emergency room] for new, worsening or concerning symptoms." She discussed her findings and recommendations with Mrs. Street and her husband. Mrs. Street was discharged with instructions to see a vascular surgeon in three to five days and with the name and contact information for a vascular surgeon.

Mrs. Street challenges the trial court's grant of Dr. Lu's motion for judgment on the informed consent claim, contending as follows. Because Dr. Lu's assessment and recommendations constituted an "affirmative treatment plan," the doctrine of informed consent required her to advise Mrs. Street of alternative treatment options and the risks "in

19

receiving and/or rejecting" them. These treatment options included immediate consultation by a vascular surgeon, immediate admission to the Hospital, and anticoagulation therapy with Heparin. Her evidence at trial showed that these alternative treatment options were reasonably available, their attendant risks, and that, had Dr. Lu so advised her, she would have elected to pursue alternative treatment options.[12] According to Mrs. Street, the evidence was legally sufficient to support a claim for lack of informed consent, and the trial court erred in granting judgment in favor of Dr. Lu.

Dr. Lu counters that the trial court's ruling was correct because Mrs. Street's evidence could not prove the elements of an informed consent claim and what she labeled an informed consent claim in fact was an ordinary medical negligence claim.[13]

Although ordinary medical negligence and failure to obtain informed consent both are rooted in negligence, they are different legal theories. *McQuitty v. Spangler*, 410 Md. 1, 18 (2009). Ordinary medical negligence claims are predicated upon a physician's "breach of the duty . . . 'to use that degree of care and skill which is expected of a reasonably competent practitioner . . . acting in the same or similar circumstances.'" *Dingle v. Belin*, 358 Md. 354, 368 (2000) (quoting *Shilkret v. Annapolis Emergency Hosp. Ass'n*, 276 Md.

---

[12] Mrs. Street's testimony was that had Dr. Lu "offer[ed] to get a vascular consultation for" her, she would have "[b]een very receptive"; had she "offered to admit [her] to the hospital that day," she "would [have been] ready to be admitted"; and had she offered to put her on Heparin, she would have "[j]umped at the idea."

[13] Dr. Lu also asserts that even if Mrs. Street could have established an informed consent claim, she "failed to provide the necessary expert testimony concerning the severity and likelihood that certain risks will occur." *See Shannon v. Fusco*, 438 Md. 24, 50-51 (2014). Our resolution of the informed consent issue makes it unnecessary to address that argument.

187, 200 (1975)). Informed consent claims rest on a physician's duty to provide sufficient information to enable the patient to "decid[e] for himself whether or not to submit to the particular therapy." *Sard v. Hardy*, 281 Md. 432, 439 (1977). In *Sard*, the Court summarized the general duty of disclosure the physician owes the patient as follows:

> Simply stated, the doctrine of informed consent imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment.

> This duty to disclose is said to require a physician to reveal to his patient the nature of the ailment, the nature of the proposed treatment, the probability of success of the contemplated therapy and its alternatives, and the risk of unfortunate consequences associated with such treatment.

*Id*. at 439-40 (citations omitted).[14]

Maryland has adopted a patient-focused version of informed consent, in which "the appropriate test" for a physician's duty of care "is not what the physician in the exercise of his medical judgment thinks a patient should know before acquiescing in a proposed course of treatment; rather, the focus is on what data the patient requires in order to make an intelligent decision." *Id.* at 442. Consequently, "the scope of the physician's duty to inform is to be measured by the materiality of the information to the decision of the patient" as "determined by reference to a general standard of reasonable conduct" rather than "a

---

[14] *See* Maryland Civil Pattern Jury Instructions ("MPJI-Cv") 27:4 ("Before a physician provides medical treatment to a patient, the physician is required to explain the treatment to the patient and to advise of any material risks, benefits, and alternatives of the treatment so that the patient can make an intelligent and informed decision about whether or not to go forward with the proposed treatment.").

professional standard of care." *Id*. at 444. Information is material when "a physician knows or ought to know [it] would be significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure." *Id.*

We review *de novo* the trial court's decision to grant Dr. Lu's motion for judgment at the close of Mrs. Street's case. *DeMuth,* 205 Md. App. at 547. Viewing the evidence in the light most favorable to Mrs. Street, as the opposing party, we ask whether a reasonable factfinder could have found the essential elements of the cause of action by a preponderance of the evidence.

Only a handful of Maryland informed consent cases directly or indirectly address the duty to inform the patient of alternative treatment options. *Sard v. Hardy*, a failed sterilization case, addressed the issue directly. The plaintiff's obstetrician performed a tubal ligation without telling her that there was a risk of failure and that other sterilization procedures with lower risks of failure were available. The Supreme Court held that the facts in evidence could support a finding that a reasonable person in the patient's position would attach considerable significance to the effectiveness and projected risk that a tubal ligation procedure would fail. *See Sard*, 281 Md. at 451. Therefore, not disclosing the "risks of failure ***and more efficient alternative methods* [*of sterilization*]** would have induced [the patient] to consent to the operation, while she would not have done so had adequate disclosure been made." *Id*. (emphasis added).

Almost twenty years later, in *Reed v. Campagnolo*, 332 Md. 226, 241 (1993), the Court indirectly addressed the duty to disclose alternative treatment options in holding that

22

when a physician does not propose any treatment the doctrine of informed consent does not apply. A mother who gave birth to a child with deformities alleged that the obstetrician breached his duty to disclose by not telling her about prenatal testing that could have revealed the fetus's condition. The Supreme Court emphasized that *Sard* "discusses the doctrine only in the context of **some treatment proposed by the health care provider.**" *Id.* (emphasis added). It concluded that whether the obstetrician should have recommended prenatal testing was properly the subject of an ordinary medical negligence claim, not an informed consent claim.

> **[O]ne's informed consent must be to some treatment.** Here, the [treating doctor] never proposed that the [prenatal] tests be done. **Whether the [treating doctor] had a duty to offer or recommend the tests is analyzed in relation to the professional standard of care.** Application of that standard may or may not produce a result identical with the informed consent criterion of what reasonable persons, in the same circumstances as the Reeds, would want to know.

*Id.* (emphasis added).[15] The Court's holding means that all that is encompassed in the duty to disclose -- including informing the patient of alternative treatment options -- does not apply when the physician has not offered any treatment option. Failure to offer treatment options the standard of care requires is to be remedied in an ordinary medical negligence action, not an informed consent action.

---

[15] The *Reed* Court took guidance from *Karlsons v. Guerinot*, 394 N.Y.S.2d 933, 939 (N.Y. App. Div. 1977), which held that a mother who gave birth to a child with deformities had no claim for lack of informed consent based on her obstetrician's failure to disclose risks that "did not relate to any affirmative treatment but rather to the condition of pregnancy itself."

In *McQuitty v. Spangler*, 410 Md. at 5-8, the Supreme Court implicitly recognized that the doctrine of informed consent embraces not only procedures and surgeries but also treatment plans. After the plaintiff suffered a partial placental abruption at twenty-eight weeks of pregnancy, her obstetrician proposed that she be hospitalized to be closely monitored for signs of another abruption while giving the fetus time to develop. She agreed. During the hospitalization, she experienced a second partial placental abruption and other complications. Her obstetrician did not tell her about these developments, disclose the risks of continuing the treatment plan under the changed circumstances, or advise her about alternative courses of treatment, including proceeding with immediate delivery. While still hospitalized according to the original treatment plan, the plaintiff suffered a complete placental abruption, resulting in injury to the baby from oxygen deprivation.

The plaintiff obtained a jury verdict in her informed consent case against her obstetrician, but the trial court granted a motion for judgment notwithstanding the verdict because there was no evidence that the obstetrician had acted so as to cause a physical invasion of the plaintiff.[16] The Supreme Court held that no such proof was required and instructed that on remand the verdict be reinstated subject to an outstanding motion for new trial or remittitur.[17] *See id.* at 22, 26, 31, 33. In the course of reviewing Maryland law on

---

[16] In a prior trial, the plaintiff had lost on ordinary medical negligence and the jury had hung on informed consent. *See McQuitty*, 410 Md. at 4.

[17] The Court explained that the doctrine of informed consent does not derive from battery but from a duty in negligence premised on the patient's right to bodily autonomy.

(continued…)

24

informed consent, the Court reiterated that the doctrine imposes a duty to inform the patient, prior to subjecting him or her to treatment, of the nature of the ailment, the nature of the proposed treatment, the probability of success of the proposed treatment *and its alternatives*, and the risk of unfortunate consequences. *See id.* at 14-15 (following Maryland Civil Pattern Jury Instructions ("MPJI-Cv") 27:4).

Given the dearth of Maryland case law on the informed consent duty to disclose alternative treatment options, we shall look to the primary cases outside our jurisdiction that have considered the duty and its scope. In *Vandi v. Permanente Med. Grp., Inc.*, 7 Cal. App. 4th 1064, 1070-71 (Cal. Ct. App. 1992), the court held that alternative treatment options the physician does not recommend because in his or her judgment they are not medically indicated are not within the scope of the duty to disclose. The plaintiff was seen in the emergency room after experiencing his first ever grand mal seizure. In consultation with a neurologist, the emergency room physician recommended that the patient undergo an MRI, which was not available for two days. The next day, he suffered complications resulting in paralysis of his left arm and leg. He sued the emergency room physician and the neurologist, alleging that they should have ordered a CT scan, which could have been performed quickly and would have revealed brain abscesses that were the cause of the seizure and paralysis. One of his theories at trial was that in obtaining consent to the MRI,

---

*See McQuitty*, 410 Md. at 25-32. It overruled *Landon v. Zorn*, 389 Md. 206, 230 (2005), which had held that a claim for lack of informed consent required evidence "that [the physician] committed an[] affirmative action in violation of [the plaintiff's] physical integrity." *Arrabal v. Crew-Taylor*, 159 Md. App. 668 (2004), likewise was overruled. *See McQuitty*, 410 Md. at 26, 33.

the physicians were obligated to inform him that a CT scan was an alternative diagnostic test.  The court declined to instruct the jury on informed consent.  After a defense verdict, the plaintiff appealed, arguing that he had made out a case for informed consent.

A California Court of Appeals affirmed, rejecting the assertion that a physician has "a duty to inform his patient of a diagnostic test which, in the physician's professional judgment, was not medically indicated."  *Id*. at 1066.  "[T]he duty of disclosure is predicated upon a recommended treatment or diagnostic procedure and that the failure to recommend a procedure must be addressed under ordinary medical negligence standards."  *Id*. at 1069-70 (citing *Scalere v. Stenson*, 211 Cal. App. 3d 1446, 1449-53 (1989)).  When a physician does not recommend a procedure that the standard of care requires be recommended, that "would be negligence under ordinary medical negligence principles and there is no need to consider an additional duty of disclosure." *Id*. at 1070.  On the other hand, when a physician does not recommend a procedure and "competent medical practice did not require" that the physician do so, "it would be inappropriate to impose such an imprecise and unpredictable burden" to disclose the non-recommended procedure as an alternative treatment option.  *Id*.  The court expressed concern that "the rule proposed by plaintiff is . . . inherently and irrevocably wedded to medical hindsight." *Id.*  It commented:

> It would be anomalous to create a legally imposed duty which would require a physician to disclose and offer to a patient a medical procedure which, in the exercise of his or her medical judgment, the physician does not believe to be medically indicated.

*Id.* at 1071.[18]

In *Matthies v. Mastromonaco*, 310 N.J. Super. 572 (1998), *aff'd*, 160 N.J. 26 (1999), a New Jersey appellate court took a different approach, holding that physicians must disclose alternative treatment options they do **not** recommend. An elderly woman who was living independently fell and broke her hip. An orthopedic surgeon decided that due to the patient's multiple medical problems, the fracture should be treated with bedrest. He did not tell her that bedrest carried a risk of hip displacement, which could render her unable to walk. The surgeon knew that surgery to place pins in the patient's hip was an alternate, and usual, treatment for the patient's condition, but in his medical judgment, the patient's bones were too weak to withstand the insertion of pins. He did not tell the patient about surgery, or its risks, which also were serious, because he did not consider it a viable option for her.

The bedrest treatment resulted in hip displacement followed by the patient's becoming immobile and confined to a care facility. She sued the surgeon for medical negligence and lack of informed consent. The trial court kept the issue of informed consent from the jury because there was no affirmative act of physical invasion by the surgeon. After the jury found against the patient on negligence, she appealed the informed consent ruling. As the Maryland Supreme Court later held in *McQuitty*, and as became the trend,

---

[18] Three years earlier that same court had held, as our Supreme Court later held in *Reed*, that "the predicate for duty to disclose alternate therapy is some proposed therapy." *Scalere v. Stenson*, 211 Cal. App. 3d 1446, 1449 (1989) (plaintiff who was progressing well after angiogram did not make out a cause of action for informed consent against physician who did not recommend further tests or treatment).

the appellate court held that a physical invasion is not an element of informed consent. Importantly for our purposes, it further held that in discharging the duty to obtain a consent that is informed, a physician must disclose all medically reasonable alternative courses of treatment, including those he or she does not recommend. If the patient chooses a non-recommended course of treatment, the physician can withdraw from treatment.

> Conventional medical judgments during the course of treatment remain for the physician to make, subject to ordinary malpractice controls. But determinations bearing upon which course of treatment to adopt are the capable patient's prerogative, assisted by as much information and advice as the physician may reasonably be able to furnish. This is especially so not only where considerations of medical risk and benefit are involved in the choice of treatment, but also where lifestyle choices and other considerations of personal autonomy are implicated. To the extent the physician has a view as to which of the reasonably available alternative courses of treatment is the best in the circumstances as a matter of medical judgment, the physician must also give the patient the benefit of a recommendation. There is no reasonable basis for the apprehension . . . that the physician will ever be required to perform surgery or administer any other course of treatment that he or she believes to be contraindicated. If the patient selects a course, even from among reasonable alternatives, which the physician regards as inappropriate or disagreeable, the physician is free to refuse to participate and to withdraw from the case upon providing reasonable assurances that basic treatment and care will continue. In such circumstances, there can be no liability for the refusal.

*Id*. at 598.

In *Cline v. Kresa-Reahl*, 229 W. Va. 203 (2012), the West Virginia Supreme Court rejected that reasoning. The patient presented to the emergency room with symptoms of a stroke. The emergency room physician contacted the on-call neurologist and asked whether the patient should be treated conservatively, with bedrest, medication, and monitoring, or aggressively, with thrombolytics ("clot buster" medication). The

28

neurologist opined that clot buster medication was contraindicated for the patient because he had undergone seeding treatment for prostate cancer. The patient was admitted to the Intensive Care Unit for conservative treatment and died the next morning.

The plaintiff sued the neurologist for lack of informed consent, alleging she should have advised the decedent of the option to receive thrombolytics. The trial court dismissed the informed consent claim because the neurologist had determined that the clot buster medication was contraindicated and a physician is not under a duty to inform the patient of an alternative treatment that is not indicated.[19]

Affirming, the appellate court compared the holdings in *Matthies* and *Vandi*. "*Matthies* stands for the proposition that physicians have an obligation to disclose and inform patients of non-recommended, but *medically reasonable* alternative treatments" and that "'[f]or consent to be informed, the patient must know not only of alternatives that the physician recommends, but of medically reasonable alternatives that the physician does not recommend.'" *Cline*, 229 W. Va. at 208 (quoting *Matthies v. Mastromonaco*, 160 N.J. 26, 38 (1999)). "In contrast, *Vandi* holds that a physician is not obliged to obtain informed consent for non-recommended treatment." *Id.* The court approved the reasoning in *Vandi* that a physician's failure to recommend a procedure that should have been recommended constitutes "simple medical negligence[.]" *Id.*

---

[19] The plaintiff also sued for ordinary medical negligence. That claim was dismissed for failure to file a certificate of qualified expert as required by West Virginia law. *See Cline v. Kresa-Reahl*, 229 W. Va. 203, 207 (2012).

29

In declining to extend the duty of disclosure "'to procedures not recommended by the physician[,]'" the court stated:

> ***To suggest that respondent—or any physician—had a duty to obtain informed consent for a non-recommended treatment modality is nonsensical and creates an unnecessary and untenable basis of liability against a physician.*** If thrombolytics were a viable and medically appropriate treatment for Mr. Cline, respondent's failure to administer the medication would give rise to a claim for medical negligence, as was, in fact, alleged in the complaint but unsupported by a screening certificate of merit. If thrombolytics were *not* medically indicated for Mr. Cline in the medical judgment of the respondent, then she had no duty to advise petitioner or her decedent about such treatment. ***Such a requirement would force physicians to describe and discuss treatment options that they have no intention of administering even if, after discussion, the patient would select it.***
>
> The doctrine of informed consent is a nebulous one complicated by semantics. However, quality physician-patient communication and the duty of disclosure occasioned by the doctrine of informed consent are not necessarily coextensive. Informed consent is implicated in situations which run the gamut from procedures to which a patient never agreed at all, to treatments, the medical implications of which were not fully communicated. ***Informed consent necessarily implicates the treatment selection process by its very nature. However, to extend the duty of informed consent, as requested by petitioner, into treatment option availability determinations— which are necessarily driven by medical judgment—beyond the scope of a patient's treatment selection choice bleeds the concept into an area governed by the general principles of competent medical practice. Informed consent is required for a particularized, selected procedure or treatment modality which is affirmatively elected by the patient. A breach of the standard of care by a physician in an area outside of the narrow construct of a physician's duty of disclosure as to a recommended medical treatment or procedure may well be equally actionable, but sounds in traditional medical negligence.***

*Id*. at 209-10 (bold emphasis added; citation omitted).[20]

---

[20] Ten years earlier, in *Hicks v. Ghaphery*, 212 W. Va. 327 (2002), the West Virginia Supreme Court had rejected the holding in *Matthies* in a case where, like in *Reed v. Campagnolo*, the physician did not make any treatment recommendation. The family of a

(continued…)

30

Several courts have held in the context of a misdiagnosis that a physician has no duty to disclose alternative treatment options he or she "has concluded are not medically indicated." *Hall v. Frankel*, 190 P.3d 852, 864-65 (Colo. App. 2008). Of course, in that situation, the medical conclusion that the alternative treatment option was not indicated was the product of the physician's having ruled out the correct diagnosis. These cases adhere to the same principle recognized in *Vandi* and *Cline*, however, that if in the exercise of medical judgment, even if that judgment is in error, the physician determines that a treatment is not indicated, there is no duty to disclose that treatment as an option. The real issue in that situation is not disclosure but whether the physician properly exercised medical judgment in determining that the treatment was not indicated. That is why these cases uniformly hold, like *Vandi* and *Cline*, that where "[t]he crux of the plaintiff's claim was [the] failure properly to diagnose and to recognize the need for further tests" or modalities of treatment, that "gives rise to a claim for negligence but not to a claim on principles of informed consent." *Roukounakis v. Messer*, 63 Mass. App. Ct. 482, 487 (2005). *See also Gomez v. Sauerwein*, 180 Wash. 2d 610, 618 (2014); *Pratt v. Univ. of Minn. Affiliated Hosps. & Clinics*, 414 N.W.2d 399, 402 (Minn. 1987); *Pergolizzi v.*

___

decedent who died of a massive pulmonary embolism, for which he was at risk after becoming paralyzed in an accident, sued his trauma surgeon for not inserting a filter in the decedent's spine that could detect blood clots. In fact, the surgeon had made no treatment recommendation. The West Virginia Supreme Court held that informed consent properly was kept from the jury, applying the reasoning in *Vandi* to a situation in which no treatment was recommended at all. *See Hicks*, 212 W. Va. at 334-35.

*Bowman*, 76 Va. App. 310, 330-31 (2022); *Linquito v. Siegel*, 370 N.J. Super. 21, 34-35 (2004).[21]

In general, experts have observed that "[b]ecause alternative treatments are rarely the focus of litigation, limited case law addresses when providers must discuss treatment alternatives[.]" RESTATEMENT (THIRD) OF TORTS: MEDICAL MALPRACTICE § 12, cmt. l & Reptrs. Notes, Tentative Draft No. 1 (Mar. 2023). Consequently, there is no "clear legal standard" to provide guidance, which "creates obvious uncertainty for when and which alternatives must be disclosed and in how much detail, especially in patient-centered jurisdictions." *Id*.

We return to the case at bar. As noted, Mrs. Street maintains that this case is analogous to *McQuitty* because Dr. Lu formulated a treatment plan and consent was required to carry it out. For her consent to be informed, she argues, Dr. Lu had to disclose "all reasonably available options and alternatives[.]" In particular, Dr. Lu should have given her the options of immediate admission to the Hospital, immediate evaluation by a vascular surgeon, and administration of Heparin, all of which Mrs. Street testified she would have accepted as alternatives to what Dr. Lu recommended.

---

[21] At least one court has held that a physician's duty includes disclosing the option of no treatment when that is an acceptable alternative. *Wecker v. Amend*, 22 Kan. App. 2d 498, 502 (1996). And one court has held that a doctor's duty to disclose encompasses treatment options that are more hazardous and aggressive than what the doctor is recommending. *Logan v. Greenwich Hosp. Ass'n*, 191 Conn. 282, 295 (1983). In those cases, however, the undisclosed treatment options were medically viable alternatives that were not contraindicated.

In our view, *McQuitty* has little in common with this case. The obstetrician in that case admitted the patient to the hospital pursuant to an affirmative, continuing treatment plan of monitoring for signs of a placental abruption, to which the patient consented. He devised the plan and implemented it. During the course of the treatment he was overseeing, the patient's physical condition changed, altering the factual predicate for the treatment plan to which she had consented. That change triggered a duty on the part of the same doctor to tell the patient of her changed condition and revise the treatment plan based on the changes. Consent to a new treatment plan would require disclosure of reasonably available alternative treatment options. Instead of telling the patient that her condition had changed and presenting an alternative plan (or plans) based on the changed circumstances, the obstetrician did nothing.

After assessing Mrs. Street's condition, Dr. Lu recommended that she be seen by a vascular surgeon in three to five days (identifying a vascular surgeon for her) or, if her symptoms worsened, to return to the emergency room for re-evaluation. Unlike the obstetrician in *McQuitty*, she did not recommend a plan or course of treatment that she (Dr. Lu) would be executing or overseeing or even be aware of. She directed Mrs. Street to another doctor in another specialty for evaluation. The point of that recommendation was for the specialist, not Dr. Lu, to determine the array of treatment options for Mrs. Street's condition. And Dr. Lu further recommended that if Mrs. Street's symptoms worsened before she was seen by the vascular surgeon, she return to the emergency room. If that were to occur, Mrs. Street would be seen by one of the emergency room physicians on duty, not by Dr. Lu, unless she just happened to be on duty then. Indeed, two days after

33

Dr. Lu made her recommendation, Mrs. Street returned to the emergency room with increased symptoms, was seen by Dr. Bassi, and was admitted to the Hospital. Dr. Lu was not involved in nor was there a plan for her to be involved in Mrs. Street's care and treatment after June 16.

As discussed, it is implicit in *McQuitty*, 410 Md. at 14-15, that the doctrine of informed consent encompasses treatment plans that are an affirmative act of medical treatment; and to obtain consent to such a treatment plan, a physician must disclose material risks and alternate treatment options. Dr. Lu's recommendations had none of the hallmarks of a treatment plan to which informed consent would apply, either by comparison to *McQuitty* or to any of the relevant cases outside Maryland we have discussed. Her recommendation that Mrs. Street be evaluated by a specialist in a defined period of time did not map out a course of treatment; it was a one-time assessment. Dr. Lu did not formulate and carry out a course of treatment for Mrs. Street.

Even if we were to assume that Dr. Lu's emergency room evaluation and recommendation *was* a treatment plan, which it was not, there is no merit in Mrs. Street's argument that Dr. Lu was obligated to disclose the alternative treatment options Mrs. Street testified she would have accepted. These options ran counter to Dr. Lu's medical finding, contemporaneously documented, that Mrs. Street's physical condition did not warrant "emergent/urgent" treatment and that there was no "clear indication for [a] condition requiring immediate inpatient hospitalization or surgery." In other words, in Dr. Lu's medical judgment, the "alternate treatment options" Mrs. Street asserts should have been disclosed were not clinically indicated for her *at that time*. Instead, unless Mrs. Street's

34

symptoms worsened, her condition warranted an evaluation by a vascular surgeon in three to five days, at which time that specialist would determine the treatment options that were reasonably available.[22] This differs from the scenarios in *Sard* and *McQuitty*, where at the relevant time there was more than one clinically indicated procedure/treatment path. (In *Sard*, a number of sterilization procedures that carried a lower failure risk, and in *McQuitty*, an immediate delivery prior to an imminent complete placental abruption.)

We agree with the courts in *Vandi* and *Cline* that it would make little sense to incorporate into the duty to disclose a requirement that physicians inform patients of alternative treatment options they will not perform or pursue because, in their medical judgment, they are not indicated. The approach to duty taken by the court in *Matthies*, that a physician must disclose non-recommended alternative treatment options the physician has concluded are not indicated and simply bow out if the patient selects one, would lead to treatment chaos, especially in an emergency room setting. For example, if Dr. Lu were required to tell Mrs. Street that immediate admission to the Hospital was a treatment option but in her medical judgment was not indicated, what would follow if Mrs. Street chose to be admitted to the Hospital? Would the other emergency room physicians on duty need to step in to evaluate Mrs. Street and decide whether, in each of their medical judgments, admission was indicated? And if all of them thought not, would she be discharged with

___

[22] In her "Medical Decision Making" note, Dr. Lu recognized that vascular surgery would need to be consulted about any "risks/benefit/alternative to starting blood thinners given h[istory]/o[f] anemia requiring transfusions[,]" the cause of which remained unknown. Heparin is a blood thinner. Thus, in Dr. Lu's medical judgment, giving Mrs. Street Heparin in the emergency room was not a reasonable treatment absent an immediate consultation by a vascular surgeon -- which she had determined was not indicated.

directions to go to another emergency room?  Given that admission to the Hospital was but

one of the alternative treatment options not recommended by Dr. Lu based on her findings,

would this same process need to be repeated for each option, if Mrs. Street selected all of

them?  It is easy to envision the total disarray that would ensue in an emergency room were

physicians required to disclose treatments they are not recommending because in their

medical judgment they are not indicated for the patient.[23]

---

[23] One legal commentator has posited that requiring physicians "to disclose a multitude of non-recommended alternative procedures" that "the physician believes are not medically indicated or relevant"

> will needlessly deplete a physician's availability by extending the average time spent consulting and diagnosing the patient's illness.  Upon hearing about the multitude of potentially relevant tests, a patient will likely become confused and request to undergo costly and irrelevant procedures to definitively rule out illnesses despite the physician having already ruled them out.  These tests will exponentially drive up overall healthcare costs.

Michael Rohde, *Information Overload: How the Wisconsin Supreme Court Expanded the Doctrine of Informed Consent*, 46 J. Marshall L. Rev. 1097, 1115-16 (2013) (footnotes omitted).  *See Jandre v. Wisc. Injured Patients & Fams. Comp. Fund*, 340 Wis. 2d 31, 51-52 (2012), *abrogated by* 2013 Wis. Legis. Serv. Act 111 (West), as stated in *Pergolizzi v. Bowman*, 76 Va. App. 310, 329 (2022) (explaining that Wisconsin legislature overturned *Jandre* decision via statutory amendment that excludes from duty to obtain informed consent "[i]nformation about alternate medical modes of treatment for any condition the physician has not included in his or her diagnosis at the time the physician informs the patient").

Likewise, other commentators question the necessity and unintended consequences of expanding the scope of informed consent beyond recommended medical treatment.  *See, e.g.,* Marc D. Ginsberg, *Informed Consent and the Differential Diagnosis: How the Law Can Overestimate Patient Autonomy and Compromise Health Care*, 60 Wayne L. Rev. 349, 350-51, 391, 394 (2014) (arguing "that the application of informed consent to the differential diagnosis[,]" which is "the process by which a physician arrives at a diagnosis[,]" "is an unnecessary expansion of the doctrine and potentially compromises

(continued…)

Beyond practicality, requiring a physician to disclose an alternative treatment option that is not indicated in the physician's medical judgment is inconsistent with the materiality element of informed consent, as recognized in Maryland. Having determined that "the scope of the physician's duty to inform is to be measured by the materiality of the information to the decision of the patient[,]" the *Sard* Court concluded that a physician need not disclose **all** risks but only **material** risks. *Sard*, 281 Md. at 439-40, 444. It follows that the same scope of disclosure would apply to alternative treatment options, *i.e.*, that a physician's duty to disclose encompasses alternative treatment options that are material. A material alternative treatment option is one the physician "knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to [have the] particular medical treatment or procedure." *Id.* at 444. When in the physician's medical judgment, an alternative treatment is not indicated for the patient, and therefore the physician will not, and should not, perform it, the physician neither knows nor ought to know that the treatment would be significant to a reasonable person in the patient's position in deciding whether to consent to the treatment or treatments the physician is offering. Just as determining the risks a particular treatment carries is a matter

health care" when applied to require a physician "to disclose the differential diagnosis, every test to explore the differential diagnosis, every treatment available for each possible diagnosis, as well as all related possible complications" because "the doctrine was intended to apply when a physician reached a diagnosis and made a treatment recommendation"); Krista J. Sterken, Michael B. Van Sicklen & Norman Fost, *Mandatory Informed Consent Disclosures in the Diagnostic Context: Sometimes Less Is More*, 17 N.Y.U. J. Legis. & Pub. Pol'y 103, 122 (2014) (pointing out that "extension of the informed consent obligation to information about tests for excluded diagnoses is likely to produce minimal, if any, benefit in most instances of patient care").

of professional judgment, assessing the treatments that are medically indicated for a patient is a matter of professional judgment.

Supreme Court dicta in two medical malpractice cases is consistent with our view on the scope of the duty to disclose alternative treatment options. In *Univ. of Md. Med. Sys. Corp. v. Waldt*, 411 Md. 207 (2009), a patient sued her physicians and others for injuries she alleged resulted from the particular type of stent used to repair her brain aneurysm. On informed consent, the plaintiff's sole evidence about material risk was her expert's proffer that the stent had not been approved by the FDA for use on her type of aneurysm. The trial court precluded the expert from testifying about informed consent because he did not have sufficient experience with the stent in question. This Court affirmed on that issue, holding that it was not preserved for review and in any event the trial court's ruling was not an abuse of discretion. In affirming as well, the Supreme Court adopted dicta in our opinion that, regardless, the expert's opinion was legally insufficient to prove material risk:

> "[The expert's proffer] is not a proffer of a risk inherent to the procedure that [the patient] underwent. It is a proffer of expert testimony that the procedure was contraindicated for [the patient], and therefore should not have been performed on her. That expert testimony would be relevant to an ordinary negligence claim, *i.e.*, that the doctors breached the standard of care in their treatment of [the patient] by performing a contraindicated procedure on her. It is not relevant to an informed consent claim."

*Id.* at 236 (quoting *Waldt v. Univ. of Md. Med. Sys. Corp.,* 181 Md. App. 217, 261 (2008)).

Likewise, in *Shannon v. Fusco*, 438 Md. 24, 47-48 (2014),[24] in which an elderly patient was administered a drug that the package insert suggested should not be given to the elderly, the Supreme Court explained that although evidence that a procedure or treatment is contraindicated may support a claim for ordinary medical negligence, it is not relevant to a claim for informed consent. The Court agreed that the trial court properly excluded the package insert from evidence. Referring to *Waldt*, the Court stated: "Because the two causes of action [ordinary medical negligence and informed consent] are distinct, we have . . . opined, in *dicta*, that evidence that a medical procedure or treatment is contraindicated for a patient is not relevant in an informed consent action." *Id.*[25]

The reasoning pertaining to contraindicated treatments, *i.e.*, those that should not be performed because they carry risks of harm, also applies to treatments that are not indicated, meaning not advisable due to a particular condition or circumstance. *See Medical Dictionary*, RXLIST, https://www.rxlist.com/indicate/definition.htm (last visited Jan. 23, 2024) ("In medicine," to "indicate" means "to make a treatment or procedure advisable because of a particular condition or circumstance."). Whether a treatment is contraindicated, due to risk, or not indicated, because it is not the proper treatment for the condition or is not necessary, it should not be performed and therefore is not a viable alternative treatment option.

---

[24] The primary issue in the case concerned whether the patient's expert witness, a pharmacist, could testify about the medical risks to the plaintiff who was prescribed the drug in question.

[25] The Court held that expert testimony is necessary to prove the material risk element of an informed consent claim. *See Shannon*, 438 Md. at 50.

In all those situations, the issue is not patient choice but whether the physician complied with the standard of care in determining that the treatment was contraindicated or not indicated. This is the basis for the decisions in other jurisdictions that the duty to disclose alternative treatments should not encompass options the physician does not recommend because they are not indicated. If non-recommended treatment options must be disclosed, the doctrine of informed consent will overlap "into treatment option availability determinations – which are necessarily driven by medical judgment – beyond the scope of a patient's treatment selection choice . . . into an area governed by the general principles of competent medical practice." *Cline*, 229 W. Va. at 209.

The case at bar exemplifies a scenario in which ordinary medical negligence is the sole applicable cause of action. The alternative treatment options Mrs. Street alleged Dr. Lu had a duty to disclose were the exact same treatments she was alleging Dr. Lu breached the standard of care by not ordering or performing. As the courts in *Vandi*, *Hicks*, and *Cline* explained, if the gravamen of a claim is that the physician should have recommended certain treatment options, and not doing so was a breach of the standard of care, the path to vindicate that wrong is a claim for ordinary medical negligence, not informed consent. Indeed, here Mrs. Street sued Dr. Lu for ordinary medical negligence and that claim was presented to the jury, complete with expert testimony by an emergency medicine doctor that Dr. Lu violated the standard of care. The jury rejected it, on the merits, returning a defense verdict. As a matter of law, she was not entitled to pursue a duplicative claim for medical negligence, minus required expert testimony on the standard of care, dressed up as a claim for informed consent.

# III.

## THE TRIAL COURT ERRED IN PRECLUDING DR. SUMPIO FROM TESTIFYING THAT DR. GONZE BREACHED THE STANDARD OF CARE FOR VASCULAR CONSULTATION

Dr. Gonze and Dr. Sumpio are vascular surgeons. Mrs. Street planned to call Dr. Sumpio to testify that Dr. Gonze breached the standard of care for vascular surgeons by failing to perform a consult on Mrs. Street on the afternoon of June 18, within two to three hours of being called by Ms. Brunson. In Dr. Sumpio's opinion, given what Dr. Gonze had learned about Mrs. Street's condition in his telephone calls with Dr. Bassi and Ms. Brunson, he was required to perform the consult within that period of time.

Before jury selection, the trial court heard argument on a motion *in limine* Dr. Gonze had filed to preclude Dr. Sumpio from testifying that he breached the standard of care on June 18. The motion was premised on VSA's internal rule for response times to consultation requests. Under that rule, the VSA on-call vascular surgeon was required to respond to a "stat" request for a consult within one hour and a routine (non-stat) request for a consult within 24 hours.[26] Dr. Gonze maintained that because the consult request for Mrs. Street was not designated "stat," the proper time frame for him to see Mrs. Street was no later than 24 hours from 1:56 p.m. on June 18. He took the position that it would confuse the jury to hear Dr. Sumpio opine that a time frame other than that imposed by VSA's

---

[26] "Stat" as used in medical jargon comes from the Latin "statim," which means "immediately." *See Medical Dictionary*, RXLIST, https://www.rxlist.com/stat/definition. htm (last visited Jan. 23, 2024) ("A common medical abbreviation for urgent or rush. From the Latin word *statim*, meaning 'immediately.'").

41

internal rule applied; and that given the rule, Dr. Sumpio did not have a factual basis for his opinion.

Mrs. Street countered that Dr. Sumpio was qualified to opine about the standard of care for the time in which a vascular surgeon should respond to a request for a consult and, in his expert opinion, the response time depended upon the information known to the vascular surgeon about the patient. Given the anticipated evidence showing what Dr. Gonze knew about Mrs. Street's condition by the end of his telephone call with Ms. Brunson on June 18, there was an adequate factual basis to support Dr. Sumpio's opinion that the standard of care required Dr. Gonze to examine Mrs. Street within two to three hours of that call. In Mrs. Street's view, whether the request for a consult was "stat" was not relevant to the standard of care governing Dr. Gonze's conduct.

The trial court granted the motion *in limine*, stating:

> I do believe that there are categories of a request for consult and I think there are two. It is either stat or it's not stat. So the Court is going to grant the defense motion in this regard with respect to [the] testimony of [Dr. Sumpio.]

* * *

> The request [in the motion *in limine*] was an order precluding [Dr.] Sumpio from offering an opinion that Dr. Gonze breached the standard of care in failing to personally evaluate Mrs. Street on June 18, 2017.

After the ruling, the lawyers made changes to their upcoming opening statements. Mrs. Street's lawyer informed the court that although he no longer would forecast Dr. Sumpio's opinion regarding June 18, he intended to tell the jurors they would hear testimony that Dr. Gonze breached the standard of care by not performing a consult on

42

June 19. Dr. Gonze's lawyer objected, emphasizing that Dr. Gonze was not the on-call vascular surgeon on June 19, and the request for a consult had been made to VSA, not to Dr. Gonze personally. Because VSA only had been sued vicariously, there was no allegation that it had breached the standard of care independent of any breach by Dr. Gonze. Therefore, there was no factual basis for Dr. Sumpio to testify that Dr. Gonze breached the standard of care on June 19.

Ultimately, after opening statements, the court expanded its ruling, precluding Dr. Sumpio from opining about Dr. Gonze's acts or omissions on June 18 *and* June 19. At the conclusion of Dr. Sumpio's testimony, Mrs. Street proffered the standard of care opinions he would have given regarding Dr. Gonze pertaining to those dates:

> Dr. Sumpio would . . . opine that Dr. Gonze breached the standard of care on June 18th, 2017, and June 19th, 2017, after he was contacted twice by employees of Upper Chesapeake [referring to Dr. Bassi and Ms. Brunson] by failing to timely consult on Janet Street, and that those breaches independently were a cause of Mrs. Street's injuries and damages, including her below the knee amputation.

On appeal, the parties take the same positions they argued below. Although both acknowledge that rulings on expert witness testimony are reviewed for abuse of discretion, Mrs. Street asserts that "[a]s a direct consequence of" that abuse of discretion, "the trial court then erred when it categorically precluded any mention of Mrs. Street's care and treatment on June 18 and 19 as legally irrelevant[,]" which is "an issue that should be reviewed *de novo*." *See Williams v. State*, 457 Md. 551, 563 (2018).

An ordinary medical negligence action, like all negligence actions, requires proof of four elements: a duty of care owed by the defendant to the plaintiff, a breach of that

duty, causation, and damages.  *See Frankel v. Deane*, 480 Md. 682, 699 (2022).  The precise nature of the duty a physician owed the patient, that is, exactly what the physician was required to do or not to do, is known as the "standard of care."  *See* Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, *The Law of Torts*, §§ 254, 292 (2d ed. May 2023 Update).  In Maryland, from 1962 until 1975, the standard of care in a medical malpractice case against a physician was subject to the "strict locality rule," *i.e.*, "the standard of care exercised by physicians in the defendant's own community or locality[.]"  *Shilkret*, 276 Md. at 188.  The strict locality and related "similar locality" rules were meant to protect rural doctors from being judged against a national standard of care, as they were thought to have limited access to the latest treatments and diagnostic methods.  The Court in *Shilkret* declined to endorse that rationale and rejected all locality rules.  It adopted the following national standard of care: A "physician is under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances."  *Id*. at 200.

That definition was incorporated into the newly enacted Health Claims Arbitration Act in 1976, *see* CJP § 3-2A-02(c)(1), and has been well settled in the law ever since.  *See, e.g., Dingle*, 358 Md. at 368 (A "plaintiff must show that the doctor's conduct – the care given or withheld by the doctor – was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities[.]").

With rare exception, the standard of care a health care provider owes a patient is not within the common knowledge of people.[27] Therefore, to prove the applicable standard of care in a medical malpractice case, whether by the plaintiff as an element of the claim or by the defendant in defense of the claim, the parties rely upon the testimony of knowledgeable expert witnesses. As our Supreme Court has explained:

> [T]he standard of care applicable to a physician in a negligence action is derivative of the general standard of care in negligence actions, ***as informed by expert testimony about what a reasonably competent similar practitioner would do in the same circumstances.***

*Armacost v. Davis*, 462 Md. 504, 527 (2019) (emphasis added). Indeed, under the Act, without a certificate by a qualified expert attesting to a breach of or compliance with the standard of care, a medical malpractice case cannot be prosecuted or defended. *See* CJP § 3-2A-02, § 3-2A-04, § 3-2A-06. Typically, the trial of a medical malpractice case plays out as a "battle of the experts," at the end of which the jury employs the evidence to decide the specific standard of care that applied and whether the physician breached it.[28]

There is no Maryland case addressing whether the standard of care in a medical malpractice case, or in any negligence case, can be fixed by the defendant's internal rules

---

[27] The exception would be a case in which a doctor breached the standard of care in such an obvious way that an expert witness would not be needed to explain, such as amputating the wrong limb. *See Am. Radiology Servs., LLC v. Reiss*, 470 Md. 555, 584 (2020); *Davis v. Armacost*, 234 Md. App. 71, 86 (2017), *rev'd on other grounds*, 462 Md. 504 (2019); *DeMuth*, 205 Md. App. at 539.

[28] Expert witness testimony also is integral to the causation and damages elements of medical negligence.

45

alone. For over a hundred years, beginning with negligence cases against streetcar operators, courts in other jurisdictions have rejected that notion.

*McKernan v. Detroit Citizens' St.-Ry. Co.*, 138 Mich. 519 (1904), is a good example. An occupant of a fire engine who was injured when it was struck by a streetcar sought to prove that the streetcar company breached its duty of care because the streetcar's speed exceeded four miles per hour, in violation of the company's internal rule. The Michigan Supreme Court held that the defendant's violation of its own rule could be some evidence of negligence but was not negligence *per se*. *See id.* at 523-24. A concurring opinion made clear that "a person cannot, by the adoption of private rules, fix the standard of his duty to others." *Id.* at 530 (Hooker, J., concurring). *See also Va. Ry. & Power Co. v. Godsey*, 117 Va. 167, 168 (1915) ("A person cannot, by the adoption of private rules, fix the standard of his duty to others. That is fixed by law, either statutory or common.").

Recently, the Michigan Supreme Court applied this principle to a medical malpractice case in which the plaintiff sought to prove that a nurse breached the standard of care by not adhering to an internal rule on the proper treatment of a nursing home patient who had vomited twice. (The decedent patient died after aspirating vomit.) Citing *McKernan*, the court emphasized that violation of a defendant's internal rule is not negligence *per se*, and, beyond that, enabling private entities to insulate themselves from liability by setting the standard of care by internal rule would be unwise:

> Allowing a private organization's rules and regulations to establish the standard of care would permit that organization to choose the standards under which it would be liable to others. Choosing this course would "send a signal to [medical providers] that they have a safe harbor from lawsuits if they

46

> comply with [standing medical orders] to the letter, whatever the consequences to the patient."

*Meyers v. Rieck*, 509 Mich. 460, 474 (2022) (quoting *Fagocki v. Algonquin/Lake-In-The-Hills Fire Prot. Dist.*, 496 F.3d 623, 630 (7th Cir. 2007) (applying Michigan law)). *See also Gallagher v. Detroit-Macomb Hosp. Ass'n*, 171 Mich. App. 761, 764-65 (1988) (in medical malpractice case for post-operative fracture, plaintiff could not use hospital's internal nursing rules about securing patient in bed after surgery to establish standard of care).

Like these Michigan cases, other courts around the country have rejected the concept that in a medical malpractice case a health care provider's internal rules themselves can establish the standard of care. *See Quijano v. United States*, 325 F.3d 564, 568 (5th Cir. 2003) (applying Texas law) ("[H]ospital rules alone do not determine the governing standard of care[.]"); *Van Steensburg v. Lawrence & Mem'l Hosps.*, 194 Conn. 500, 506 (1984) ("[H]ospital rules, regulations and policies do not themselves establish the standard of care[.]"); *Hodge v. UMC of Puerto Rico, Inc.*, 933 F. Supp. 145, 148 (D. P.R. 1996) ("Courts in the United States have almost universally held that hospital rules, regulations, and policies alone do not establish the standard of medical care in the medical community[.]"); *Moyer v. Reynolds*, 780 So. 2d 205, 208 (Fla. Dist. Ct. App. 2001) (Evidence of the breach of an internal rule "does not conclusively establish the standard of care[.]"); *Cooper v. Eagle River Mem'l Hosp., Inc.*, 270 F. 3d 456, 462 (7th Cir. 2001) (applying Wisconsin law) (internal procedures of a private organization do not set the standard of care applicable to negligence cases); *Foley v. Bishop Clarkson Mem. Hosp.*,

47

185 Neb. 89, 93 (1970) (internal regulations of hospital are not sufficient to establish the standard of care); *cf. Fisk v. McDonald*, 167 Idaho 870, 882 (2020) (in state that follows the locality rule, hospital's internal rule was insufficient alone to provide foundation for an out-of-area expert witness's testimony about the standard of care).

Although Maryland courts have not addressed the precise question before us, they have held that, just as **noncompliance** with a statute is evidence of negligence and not negligence *per se*, **compliance** with a statute does not insulate a defendant against a finding of negligence. *See Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 743 (1993) ("[C]ompliance with a statute does not necessarily preclude a finding of negligence . . . where a reasonable person would take precautions beyond the statutorily required measure."); *Leonard v. Sav-A-Stop Servs., Inc.*, 289 Md. 204, 212 (1981) ("'[C]ompliance with a legislative enactment . . . does not prevent a finding of negligence where a reasonable man would take additional precautions.'" (quoting RESTATEMENT (SECOND) OF TORTS, § 288C (1964))).

In *Bentley v. Carroll*, 355 Md. 312 (1999), the Supreme Court recognized that principle in a medical malpractice case. The plaintiff alleged that the defendant physicians failed to diagnose ongoing sexual abuse being perpetrated against their young patient. At trial, there was conflicting evidence as to whether the physicians had complied with a statute requiring them to report suspected child abuse to the authorities. The plaintiff asked for an instruction informing the jury that even if the defendants' conduct "'may have complied'" with the mandatory reporting statute, "'their compliance with the statute does not necessarily preclude a finding of negligence if you determine, after reviewing all of the

48

evidence, that a reasonable person would have taken precautions beyond the statutorily required measure.'" *Id.* at 321. The Supreme Court held that the trial court erred by refusing to give the instruction. *See id.* at 321-22.

Our Supreme Court also has observed in *dictum* that customs and practices of a profession do not themselves establish the standard of care. In *Armacost v. Davis*, 462 Md. at 527 n.12, the Court held that a trial court in a medical malpractice case did not err by giving jury instructions generally applicable to negligence cases as well as instructions specific to medical malpractice cases. In discussing proof of the standard of care in a malpractice case, the Court noted:

> Maryland law has never delegated the standard of care applicable to a profession entirely to the custom and practice of the particular profession. This is consistent with the law's general reluctance to yield the application of legal standards and oversight of the conduct of a trade or profession entirely to members of that trade or profession.

*Id.* (citing *Tex. & Pac. Ry. Co. v. Behymer*, 189 U.S. 468, 470 (1903) (Holmes, J.) ("What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence[.]")).[29]

---

[29] This is consistent with the holdings of courts in other jurisdictions. *See Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479, 483 (6th Cir. 1973) (applying Ohio law) (Defendant supplier of liquified petroleum gas to house where gas explosion killed resident argued that it was not negligent because worker complied with industry's customary "sniff test" for presence of sufficient odorant. Court rejected, saying: "[T]he rule in Ohio is that conformity to customary methods or conduct is not conclusive on the question of negligence but is a circumstance to be weighed with other factors. . . . [I]ndustry standards are not binding on the issue of negligence."); *Darling v. Charlestown Cmty. Mem'l Hosp.*, 33 Ill. 2d 326, 332 (1965) (Customs established by a medical organization "did not conclusively determine the standard of care[.]").

To be sure, internal rules of private entities differ significantly from statutes, which are the product of an elected body serving the public function of enacting laws to further public policy, and from customs and practices, which are reached by consensus of members of a profession. These differences militate ***against*** the internal rules of private entities having a controlling effect on the standard of care the entities owe to others, however. As the courts in other jurisdictions that have addressed this issue have acknowledged, it would defeat the compensatory purpose of tort law to permit a defendant, and in particular a health care provider, to fix the standards of care it owes to others.

If the law generally is reluctant "to yield the application of legal standards and oversight of the conduct of a trade or profession entirely to members of that trade or profession[,]" *Armacost*, 462 Md. at 527 n.12, it should be loath to grant health care providers the power to establish by internal rule the sole standard of care applicable in a malpractice case against it. A standard of care fixed by a health care provider's own rule would be tantamount to a super locality rule, contrary to the Supreme Court's rejection of local standards of care almost fifty years ago. A federal court recognized this in a case decided under Minnesota law, where the plaintiff argued that the defendant breached the standard of care by violating its own internal policy:

> [I]t is not enough for a plaintiff simply to point to a healthcare provider's policies and claim they were breached. This conclusion, of course, flows from the fact [that] a plaintiff asserting medical negligence must establish [that] a physician breached the standard of care *in the relevant medical community* – **not just at her hospital**.

*Damgaard v. Avera Health*, 108 F. Supp. 3d 689, 699 (D. Minn. 2015) (bold emphasis added). Likewise, whether a physician's acts or omissions breached or complied with the

standard of care should not turn solely on a rule adopted by the physician's own practice, hospital, or health care organization.

In the case at bar, the trial court ruled that the standard of care for the time period by which a vascular surgeon should respond to a consult request was set by VSA's internal rule; and therefore Dr. Sumpio's opinion about Dr. Gonze's conduct on June 18, being inconsistent with that rule, was not admissible. The court erred as matter of law, thereby abusing its discretion, in deciding not only that VSA's internal rule established the standard of care but also that that standard was conclusive, so as to render any conflicting standard of care opinion inadmissible. *See generally Matter of Jacobson*, 256 Md. App. 369, 405 (2022) (recognizing that because "a court's discretion is always tempered by the requirement that the court correctly apply the law applicable to the case[,] . . . an error in applying the law can constitute an abuse of discretion" (quotation marks and citation omitted)). First, for the reasons we have explained, VSA's internal rule did not fix the standard of care. And second, Dr. Sumpio was a qualified vascular surgeon with knowledge and experience on which to base a standard of care opinion about what a reasonably competent vascular surgeon would do in the same or similar circumstances.

Dr. Gonze did not challenge Dr. Sumpio's expert credentials or argue that he failed to meet the criteria for testifying as an expert witness under Rule 5-702, except for a suggestion that his opinion did not rest on an adequate factual basis. However, the medical records and proffered testimony of Dr. Bassi and Ms. Brunson furnished an adequate factual foundation for Dr. Sumpio's opinion. The opinion was premised upon Dr. Gonze knowing details of Mrs. Street's condition that the evidence would show were

51

communicated to him by Dr. Bassi and Ms. Brunson, as documented in the hospital records and as they would testify.

Given that Dr. Sumpio's opinion concerning Dr. Gonze's acts and omissions on June 18 was admissible standard of care evidence and VSA's internal rule was not itself evidence conclusively setting the standard of care, Dr. Gonze's argument that admitting both would have confused the jury lacks merit. To be sure, a trial court has discretion to exclude evidence if its probative value is outweighed by, among other things, the danger of "confusion of the issues[.]" Md. Rule 5-403. Conflicting opinion testimony by expert witnesses, being part and parcel of the trial process in most medical malpractice cases, does not create a risk of confusion. Juries in those cases are expected to hear conflicting opinions about what the standard of care requires a defendant health care provider to do or not to do, sort through them, and decide what to credit or reject.

The trial court's rulings about Dr. Sumpio's testimony and VSA's internal rule ended Mrs. Street's claim of negligence based on Dr. Gonze's acts and omissions on June 18 before the evidence phase of the trial began. For that reason, the parties did not argue the admissibility of the internal rule and the court did not rule on that question. We point out that, although a private defendant's internal rule alone cannot fix the standard of care or be sufficient proof of the standard of care, courts that have considered the admissibility of such evidence have for the most part concluded that it can come in to show "some evidence" of negligence or, in a case like this, non-negligence. *See, e.g.*, *Meyers v. Rieck*, 509 Mich. at 478-80 (Although the defendant's internal rule was not conclusive on the standard of care, it was not "categorically inadmissible" as it might constitute "some

52

evidence" of the standard of care.);[30] *Quijano v. United States*, 325 F.3d at 568 ("[A] hospital's internal policies and bylaws may be evidence of the standard of care, but hospital rules alone do not determine the governing standard of care."); *Van Steensburg v. Lawrence & Mem'l Hosps.*, 194 Conn. at 506 (same). *But see Pullen v. Nickens*, 226 Va. 342, 350-51 (1983) (acknowledging that most jurisdictions hold that a defendant's internal rules are admissible as some evidence of the standard of care but adhering to the holding in *Va. Ry. & Power Co. v. Godsey*, 117 Va. at 168, that they are not admissible). On remand, if the claims against Dr. Gonze regarding the time period before June 20 are tried, it will be within the court's discretion to decide whether the internal rule is admissible to show some non-negligence on Dr. Gonze's part, for example, to illuminate his thought process at the relevant time. If the trial court decides to admit the internal rule into evidence, the judge also will have discretion to instruct the jury about the limited role the rule plays on the standard of care issue.

Finally, the primary claim against Dr. Gonze at issue in this appeal concerned his failure to perform a consult on Mrs. Street on June 18. The claim for failure to perform a consult on June 19 was a secondary outgrowth of the court's rulings about the internal rule and Dr. Sumpio's expected testimony. In any trial on remand, our ruling regarding the admissibility of Dr. Sumpio's testimony about June 18 applies to testimony about acts or omissions of Dr. Gonze on June 19.

---

[30] The court admonished, however, that the jury should be cautioned that the existence of the internal rule does not itself fix the standard of care. *See Meyers v. Reick*, 509 Mich. 460, 481 (2022).

# IV.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN ALLOWING DEFENDANTS SEPARATE PEREMPTORY CHALLENGES

In a civil case with one party to a side, each party may exercise four peremptory challenges for the six regular jurors and one peremptory challenge for up to three alternate jurors. Under Md. Rule 2-512(e)(2), when there is more than one party on one or both sides of a case,

> all plaintiffs shall be considered as a single party and all defendants shall be considered as a single party unless the trial judge determines that adverse or hostile interests between plaintiffs or between defendants justify allowing one or more of them the separate peremptory challenges available to a single party.

Application of this

> rule envisions a two-step analysis. "First, the court must make a factual finding of adverse or hostile interest, and second, the court, in its discretion, must determine whether that interest would justify allowing the added challenges." Thus, an adverse interest does not *per se* warrant added peremptory strikes. The party requesting extra peremptory strikes carries the burden of proving the adverse or hostile interest. This is clearly a discretionary matter for the trial court.

*Garlock, Inc. v. Gallagher*, 149 Md. App. 189, 214 (2003) (citations omitted).

Anticipating that the defendants might request extra peremptory strikes, Mrs. Street filed a pre-trial motion to limit the defendants collectively to a total of four peremptory challenges plus one challenge for alternate jurors. She argued that there were no adverse or hostile interests between the two groups of defendants -- the Hospital, UCEMP, and Dr. Lu ("Hospital defendants"), on the one hand, and VSA and Dr. Gonze ("VSA defendants"),

54

on the other -- as evidenced by there being no cross-claims. She maintained that the defendants all "breached the same standards of care" by not timely diagnosing and treating her condition and that they had "the same interest in persuading the jury" that they did not do so. Both groups of defendants filed oppositions pointing out potential conflicts between them arising from "the chronology" of events, *i.e.*, that the Hospital defendants' contact with Mrs. Street preceded Dr. Gonze's contact with her, which set the stage for blame-shifting both on issues of the standard of care and causation.

On May 31, 2022, the first day of trial, the court heard argument on Mrs. Street's motion.[31] The Hospital defendants argued as follows. Mrs. Street's pretrial conference statement made clear that the jury would hear evidence that the defendants, in serial fashion, delayed in diagnosing and treating her diminished arterial blood flow, resulting in tissue death and ultimately below-the-knee amputation. The chronology of events would allow the VSA defendants to blame the delays on the Hospital defendants and, with respect to causation, take the position that by the time Dr. Gonze saw Mrs. Street, it was too late to avert the amputation. Dr. Bassi's dismissal as a defendant shortly before trial created the appearance that Dr. Lu's period of responsibility extended from June 16 through June 20, when Dr. Gonze first saw Mrs. Street. In addition, Dr. Bassi remained a key witness and an agent of UCEMP, and whether he adequately informed Dr. Gonze of Mrs. Street's condition in their telephone call on June 18 was in dispute. Dr. Gonze could defend against liability by criticizing Dr. Bassi, and therefore UCEMP.

---

[31] May 31 and parts of June 1 and June 2 were spent on motion hearings and other preliminary matters. The jury was selected on the afternoon of June 1.

Dr. Gonze's counsel agreed that the chronology of events set up the adversity between the defendant groups, and emphasized that the disputed telephone conversation between Dr. Bassi and Dr. Gonze was the foundation for Mrs. Street's claim against Dr. Gonze. "So, even though Dr. Bassi is no longer a Defendant, that discussion between the two of them becomes critically important in terms of whether Dr. Gonze had an independent obligation despite not being specifically asked to do a stat consult to see the patient based upon a disputed conversation[.]"

Mrs. Street's counsel replied that "the problem with" that "characterization of the chronology of the events and how things are going to work is that you will never hear [Mrs. Street] stand up and say that the [H]ospital, Dr. Bassi, [counsel's] former client now a witness, was negligent on the 18th." Because Mrs. Street was "not going to say that Dr. Bassi breached the standard of care on June the 18th[,]" the "premise of Dr. Gonze pushing back at the [H]ospital simply doesn't exist."

The trial court denied Mrs. Street's motion, explaining why it was ruling to allow separate peremptory challenges for the two defendant groups:

> I do think factually, regardless of whether the Plaintiff culls out separate negligence of Dr. Bassi or not, how the jury will interpret that and how the sort of pushing back on the facts may or may not occur by the Defendants during the course of the case leads the Court to make the determination that there are sufficient hostile interests here that the defense, each wing of the defense should have their own set of peremptory strikes.
>
> I will allow the Defendants to revisit this issue as we go along with general voir dire and if the case is going to require another day and a half of impaneling a jury I'll allow them to come back to the Court and say, Your Honor, we have enough perhaps. But officially the ruling is I'll give them full peremptory strikes.

56

On appeal, Mrs. Street contends the circuit court abused its discretion by granting each defendant group five peremptory strikes because there was no showing of "adverse hostile interest[s] . . . let alone how any adverse or hostile interests would rise to the level necessary to justify additional challenges." She emphasizes, as she did below, that no cross-claims were filed and that she had pledged before trial that she would not be putting on evidence that Dr. Bassi was negligent. She argues that any adversity between the two groups of defendants concerning "the afternoon of the 18th to the afternoon of the 19th" was undone by the subsequent rulings precluding her "from raising any issues related to Dr. Gonze on June 18 or 19, creating a nearly 4-day gap between the alleged breaches of the standard of care associated with Dr. Lu and Dr. Gonze, respectively." In her view these rulings produced "an attenuated connection" that made "the alleged breaches of the standards of care . . . completely separate and distinct as it related to each set of Defendants[.]" Mrs. Street also maintains that the defendants did not take adverse or hostile positions during discovery and their experts did not cast blame so as to suggest that their interests were adverse or hostile.

The appellees counter that because the ruling on peremptory strikes was made two days before the ruling that precluded Dr. Sumpio from testifying that Dr. Gonze breached the standard of care on June 18 and 19, "the represented adversity between" the two groups of defendants "existed" when the court ruled on peremptory strikes. Moreover, regardless of the later ruling about Dr. Sumpio, "[a]s a practical and legal reality, the defenses of these separate providers had the potential to pit the Defendants against one another and to have them point the finger at the other." As examples, Dr. Gonze might advance "a defense that

57

Dr. Lu should have recognized on June 16, 2017 that Mrs. Street's lower extremity was at risk and requested a vascular consultation which would have potentially avoided the need for amputation"; and Mrs. Street intended to use the testimony of Dr. Bassi, an agent of one of the Hospital defendants, to undermine Dr. Gonze's testimony about the substance of their telephone call on June 18. The appellees assert that whether actual finger-pointing did not play out at trial did not render the trial court's decision, based on the potential for finger-pointing, an abuse of discretion. Moreover, "[t]he causation adversity issues between the [defendants] existed [when the ruling was made] and continued to exist throughout the trial."

Courts have long recognized that "[p]eremptory challenges are a venerated and invaluable tool[,]" both "in what some consider the art of jury selection" and "in effectuating a party's right to an impartial jury." *Goren v. U.S. Fire Ins. Co.,* 113 Md. App. 674, 696 (1997) (citing *Swain v. Alabama*, 380 U.S. 202 (1965); *Lewis v. United States*, 146 U.S. 370 (1892)). "In Maryland, the importance of such strikes has consistently been reaffirmed by practice, statute, and rule[,]" including the provision allowing separate challenges when "[c]o-parties, while sharing a common adversary, . . . have differences between themselves significant enough so that a single set of challenges does not adequately address their individual interests in shaping the jury." *Id.* at 696-97.

*Garlock, Inc. v. Gallagher*, 149 Md. App. at 214, an asbestos product liability case cited by Mrs. Street, is easily distinguishable and does not support her position that the interests of the two defendant groups were not adverse or hostile. There, the trial court denied a motion to grant separate peremptory challenges because "all the defendants

58

manufactured and distributed the same type of product, and they shared the common purpose of persuading the jury that those products did not emit respirable asbestos fibers." *Id*. at 214. Pointing to "the discretion afforded the trial court in this arena, and the reasonable basis for its decision in this case," we declined to "disturb its ruling." *Id*. at 215.

In contrast to *Garlock*, where the defendants clearly would not be implicating each other, here the trial court found that the defenses available to the VSA defendants could be adverse to the defenses available to the Hospital defendants. The record supports that finding. The parties' pretrial filings and counsels' argument showed the potential for finger-pointing between the Hospital defendants and the VSA defendants on standard of care and causation, both overt and implicit. As the trial court explained, even if defense counsel for one group did not openly cast blame on a defendant from the other group, jurors still would be drawing their own inferences about whether each health care provider breached the standard of care. Given the timeline, a breach by one defendant group could militate against there being a breach by the other in the jurors' minds. At the outset of trial, even after the ruling about Dr. Sumpio, Dr. Gonze could have defended against the claim that he did not render adequate care on or after June 20 by pointing to Dr. Lu's earlier failure to perform additional tests or seek a vascular consult on June 16, and/or to Dr. Bassi's not performing adequate diagnostic testing or vascular care. Likewise, the Hospital defendants could have defended on causation based on Dr. Gonze's not evaluating or treating Mrs. Street until two days after Dr. Bassi consulted him. Finally, as the court also recognized, the two groups of defendants could take differing positions about the content

59

of the telephone call between Dr. Bassi and Dr. Gonze, each to its own benefit and to the other's detriment. It was irrelevant to this dispute and to the overall adverse positions of the defendant groups that Mrs. Street promised not to criticize Dr. Bassi. We decline to engage in *post hoc* evaluation of these potential conflicts based on the fact that these potential adversities did not actually manifest themselves during trial.

There were sufficient factual grounds for the trial court to find potential adversity or hostility of a level to exercise discretion to allow separate peremptory challenges by each defendant group. The court did not abuse its discretion by allowing separate peremptory strikes.[32]

**V.**

**THE TRIAL COURT DID NOT ERR IN GIVING THE THEN CURRENT PATTERN JURY**

**INSTRUCTION ON CAUSATION**

In the final issue on appeal, Mrs. Street challenges the trial court's decision to give the jury instruction on causation requested by the appellees, and not to give the instruction she requested. We review a decision to grant or deny a requested jury instruction for abuse

---

[32] As "additional good cause" for the trial court's ruling, the appellees argue that because the "juror lists" showing "which potential jurors were stricken and/or by which party" are not in the record, it is impossible to tell whether there was an overlap in the exercise of strikes by the two defendant groups and therefore whether there was any prejudice from the court's ruling. In response, Mrs. Street correctly points out that from the panel of 24 potential jurors, the numbers of the jurors seated shows that "15 separate jurors were stricken as the result of the parties' peremptory strikes," resulting in nine being empaneled, with six jurors and three alternates. That necessarily means that "both sets of Defendants struck 5 separate jurors for a total of 10 strikes with no overlapping strikes[.]"

60

of discretion.  *See Webb v. Giant of Md., LLC*, 477 Md. 121, 142 (2021).  A requested instruction should be given when it is generated by the evidence, is a correct statement of the law, and is not fairly covered by the instruction actually given.  *See id.*

The trial court gave an instruction on causation that, with one minor non-substantive change, was taken from the version of the Fifth Edition of the Maryland Civil Pattern Jury Instructions in effect at the time of trial.  Maryland pattern jury instructions, both criminal and civil, are developed by committees of the Maryland State Bar Association and are published in editions that are updated regularly.[33]  The causation instruction as given stated:

> For the plaintiff to recover damages the plaintiffs' injuries must result from and be a reasonable and foreseeable consequence of the defendants' negligence.

> There may be more than one cause of an injury, that is, several negligent acts may work together to cause an injury.

> Each person whose negligent act is a substantial factor in causing an injury is responsible.

*See* MPJI-Cv 19:10 (5th ed. 2020 Repl.) ("5th edition instruction").[34]

---

[33] Although the use of pattern jury instructions is not required, "they are the product of consensus of experienced practitioners and judges, and [the Supreme Court] has, on occasion, encouraged their use." *Armacost v. Davis*, 462 Md. 504, 516 n.5 (2019) (citing *Ruffin v. State*, 394 Md. 355, 373 (2006)).

[34] The trial court changed "reasonably foreseeable" in the first sentence of the pattern instruction to "reasonable and foreseeable."  In the pattern instruction, the second and third paragraphs are bracketed, to be used when there is more than one defendant, as in this case. The language of this instruction has not changed since the time of trial. *See* MPJI-Cv 19:10 (5th ed. 2023 Repl.).

Mrs. Street had requested the following instruction on causation, taken from the superseded Fourth Edition of the Maryland Civil Pattern Jury Instructions:

> For a plaintiff to recover damages, the defendant's negligence must be a cause of the plaintiff's injury. [There may be more than one cause of an injury, that is, several negligent acts may work together. Each person whose negligent act is a cause of injury is responsible.]

*See* MPJI-Cv 19:10 (4th ed.) ("4th edition instruction").[35] The court declined to give that instruction.

Mrs. Street contends the trial court abused its discretion by refusing to give her requested 4th edition instruction and instead giving the 5th edition instruction. She argues that the instruction given was an incorrect statement of the law because it "subverts the holding in" *Stickley v. Chisholm*, 136 Md. App. 305, 313-14 (2001), that in a medical malpractice case the plaintiff only must prove that the defendant's breach of the standard of care was *a* cause of the alleged injury, not *the* cause of the alleged injury. She points out that *Stickley* has not been overruled and that the federal district court in Maryland has followed it. *See, e.g., Young v. United States*, 667 F. Supp. 2d 554, 561 (D. Md. 2009) ("Under Maryland law, . . . negligence that qualifies as a proximate cause of an injury need not be the sole cause. Rather, an injury may have more than one 'proximate cause.'" (citations omitted)).[36] She further asserts that the 5th edition instruction incorrectly

---

[35] The 4th edition instruction actually used "a plaintiff" not "the plaintiff" in its first phrase.

[36] When the trial in *Stickley* took place, it already was established that a defendant's negligence had to be "a" cause, not "the" cause, of the plaintiff's injuries. The instruction the trial court in *Stickley* agreed to use said so. However, when the trial court read the

(continued…)

62

includes language about reasonable foreseeability, which, she argues, is a "separate tort law concept[]" from causation, and often is a question of law for the court and not of fact for the jury.

The appellees counter that the instruction given by the court accurately stated the law on causation and made clear that there can be more than one cause of a plaintiff's injury. They further argue that even if the court erred, Mrs. Street cannot show prejudice because, at her request, the verdict sheets did not separate the issues of breach of the standard of care and causation. By answering "no" to the questions combining those issues, the jurors could have found no breach or no causation or both. If they found only that there was no breach of the standard of care, which they could have, the instruction on causation was immaterial to the verdict.

We need not reach the issue of prejudice because the 5th edition jury instruction as given was an accurate statement of the law that fairly covered the issue of causation. The instruction made clear that a defendant's breach need not be the sole cause of the plaintiff's injuries for the plaintiff to recover. In the first sentence, the phrase "the plaintiffs' injuries must result from and be *a* reasonable and foreseeable *consequence* of the defendants' negligence[,]" is no different from saying "the defendant's negligence must be *a cause* of the plaintiff's injuries." (Emphases added.) In this context, "a" consequence means the same thing as "a" cause and neither says nor suggests that the defendant's negligence must be *the only* cause of the plaintiff's injuries. The second sentence of the instruction further

instruction to the jury, it mistakenly used the word "the" in place of "a." *See Stickley v. Chisholm*, 136 Md. App. 305, 313 (2001).

63

explained that more than one negligent act "may work together" to cause an injury, that is, a defendant may cause the plaintiff's injury by committing more than one negligent act and more than one defendant may cause the plaintiff's injury by committing negligent acts. This language is inconsistent with the notion that there must be one sole cause of the plaintiff's injury.

The last sentence of the instruction the court gave sets forth the substantial factor test that is well established in Maryland law when there is more than one defendant: "Each person whose negligent act is a substantial factor in causing an injury is responsible." *See Yonce v. SmithKline Beecham Clinical Lab'ys, Inc.,* 111 Md. App. 124, 138 (1996) (explaining that the "substantial factor" test of causation in fact applies to "resolve situations in which two independent causes concur to bring about an injury, and either cause, standing alone, would have wrought the identical harm"). This last sentence of the instruction does not say or imply that there must be one sole cause of the plaintiff's injuries.

In addition, the instruction's use of the adjectives "reasonable and foreseeable" (or in the current version, "reasonably foreseeable") to describe what a consequence (*i.e.*, a cause) of the defendant's conduct must be for there to be liability is based on well-established concepts of causation in tort law. Proximate causation consists of two parts: cause in fact and legally cognizable cause. *Id.* at 137. The "substantial factor" test and the more direct "but for" test that applies when there is one defendant apply to causation-in-fact. By contrast, legal causation is a function of "whether the actual harm to a litigant falls within a general field of danger that the actor should have anticipated or expected." *Pittway Corp. v. Collins*, 409 Md. 218, 245 (2009). In other words, "[t]he question of legal

causation most often involves a determination of whether the injuries were a foreseeable result of the negligent conduct." *Id.* at 246.

Mrs. Street argues that reasonable foreseeability should not be included in a jury instruction because it usually is a question for the court. That is incorrect. Whether a duty exists to begin with, which may involve determinations of foreseeability, is a question for the court. *See Yonce*, 111 Md. App. at 141. In this case, there is no dispute that the defendants owed duties of care to Mrs. Street as their patient. When duty is not a disputed issue, foreseeability as it relates to causation ordinarily is a question of fact to be decided by the trier of fact, here, the jury. *Id. See also Collins v. Li*, 176 Md. App. 502, 536 (2007).

The instruction given by the court was generated by the evidence, correctly stated the law, and was not fairly covered by any other instruction to the jury. The court did not err in giving the instruction and declining to give the instruction requested by Mrs. Street.

> **JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY IN FAVOR OF UPPER CHESAPEAKE MEDICAL CENTER, INC., UPPER CHESAPEAKE EMERGENCY MEDICINE PHYSICIANS, LLC, AND LE NHA LU, M.D. AFFIRMED.**
>
> **JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY IN FAVOR OF VASCULAR SURGERY ASSOCIATES, LLC, AND MARK GONZE, M.D. VACATED ONLY WITH RESPECT TO ALLEGATIONS OF MEDICAL MALPRACTICE ON JUNE 18, 2017, AND JUNE 19, 2017. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; JUDGMENT OTHERWISE AFFIRMED.**
>
> **COSTS TO BE PAID ONE-HALF BY THE APPELLANTS AND ONE-HALF BY VASCULAR SURGERY ASSOCIATES, LLC, AND MARK GONZE, M.D.**